**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| ECOFACTOR, INC., | |
| Plaintiff, | Case No. 6:20-cv-00078-ADA |
| v. | **JURY TRIAL DEMANDED** |
| ECOBEE, INC., | |
| Defendant. | |
| ECOFACTOR, INC., | |
| Plaintiff, | Case No. 6:21-cv-00428-ADA |
| v. | **JURY TRIAL DEMANDED** |
| ECOBEE, INC., | **LEAD CASE** |
| Defendant. | |

**DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S NEW, UNDISCLOSED AND
UNTIMELY EXPERT OPINIONS CONCERNING INFRINGEMENT AND VALIDITY**

**<u>TABLE OF CONTENTS</u>**

I.      Introduction ....................................................................................1

II.     Factual Background .........................................................................2

    A.      -00078 Litigation Timeline ...................................................2

    B.      -00428 Litigation Timeline ...................................................3

    C.      Mr. de la Iglesia's Untimely Infringement Opinions .....................4

        1.      '100 Patent ...............................................................4

        2.      '890 Patent ...............................................................6

    D.      Mr. Zeidman's Untimely Opinions Regarding the '327 Patent .......9

    E.      Dr. Palmer's Untimely Opinions Regarding Secondary
        Considerations .........................................................................9

III.    Legal Standard ................................................................................12

IV.     Argument ........................................................................................13

    A.      Mr. de la Iglesia's New Opinions Regarding HVAC Minimum Off
        Times Should Be Stricken ......................................................14

    B.      Mr. de la Iglesia's New Opinions Regarding AutoPilot Should Be
        Stricken ...............................................................................15

    C.      Mr. Zeidman's New Doctrine Of Equivalents Opinions Should Be
        Stricken ...............................................................................17

    D.      Dr. Palmer's New Opinions Regarding Long-felt Need, Failure by
        Others, and Industry Skepticism Should Be Stricken ..................18

V.      Conclusion ......................................................................................21

████████████████
████████

## Table of Authorities

**Cases**

*Arterbury v. Odessa Separator, Inc.*, No. 5:16-cv-00183-RWS-RSP, 2019 WL 6700978 (E.D. Tex. Jan. 22, 2019) ................................................................................................................ 17

*Biscotti, Inc. v. Microsoft Corp.*, No. 2:13-CV-01015-JRG-RSP, 2017 WL 2267283 (E.D. Tex. May 24, 2017) ..................................................................................................................... passim

*KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007) .................................................................... 21

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355 (Fed. Cir. 2006) ................. 12

*Pavo Solutions LLC v. Kingston Technology Company, Inc.*, No. 8:14-cv-01352-JLS-KES, 2019 WL 8138163 (C.D. Cal. Nov. 20, 2019) ................................................................................. 19

*Pisony v. Commando Constructions, Inc.*, Case No. 6:17-cv-00055-ADA, 2020 WL 4934463 (W.D. Tex. Aug. 24, 2020) ....................................................................................................... 13

*Semcon IP Inc. v. MediaTek Inc.*, No. 2:16-cv-00437-JRG-RSP, 2018 WL 4501871 (E.D. Tex. Feb. 28, 2018) ............................................................................................................... 13, 15, 20

*Sycamore IP Holdings LLC v. AT&T Corp.*, Case No. 2:16-CV-588-WCB, 2017 WL 4517953 (E.D. Tex. Oct. 10, 2017) ............................................................................................... 15, 16, 18

*Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272 (Fed. Cir. 2012) ............................... 13

**Rules**

Fed. R. Civ. P. 26(e)(1) ................................................................................................................. 13

Fed. R. Civ. P. 37(c)(1) ................................................................................................................. 13

██████████████████████████

████████████████

## I.      Introduction

Defendant ("ecobee") asks the Court to exclude new and untimely opinions concerning matters of infringement and validity that were not included in EcoFactor's contentions, but rather were improperly raised for the first time in Plaintiff's ("EcoFactor") expert reports.

Erik de la Iglesia is EcoFactor's infringement expert concerning the '100, '186 and '890 Patents.  In his infringement report (the "de la Iglesia Report"), Mr. de la Iglesia asserts new and previously undisclosed theories of infringement that were never previously identified in EcoFactor's Final Infringement Contentions: (1) for the '100 Patent, an infringement theory based upon ventilation minimum off times imposed by ecobee thermostats; and (2) for the '890 Patent, a theory that "AutoPilot"—an ecobee smart security service that was never accused of infringing any patents by EcoFactor—practices geofencing and, thus, allegedly infringes the Patent.  These previously undisclosed opinions are untimely and should be stricken.

Robert Zeidman is EcoFactor's infringement expert concerning the '327 Patent.  In his infringement report (the "Zeidman Report"), Mr. Zeidman improperly raises new and previously undisclosed doctrine of equivalents arguments which are not based on any newly discovered evidence or developments in the case since service of EcoFactor's Final Infringement Contentions. These late disclosed infringement theories, too, should be stricken.

John A. Palmer, Ph.D. is EcoFactor's validity expert.  In his validity report (the "Palmer Report"), Dr. Palmer asserts new and previously undisclosed theories regarding secondary considerations of non-obviousness for the '890 Patent.  Specifically, the Palmer Report sets forth pages of opinions with respect to long-felt need, failure by others, and industry skepticism that were not included in EcoFactor's contention interrogatory responses.  EcoFactor has no justification for the delay in presenting its secondary considerations theories because Dr. Palmer's

opinions were not based upon any newly discovered evidence that could not have been discovered and disclosed prior to the cutoff of fact discovery.

By concealing these theories of infringement and validity until after the close of discovery, EcoFactor has deprived ecobee of an opportunity to take discovery directed to these new theories, develop responsive strategies, and include related discussions in its expert reports. Moreover, the extensive litigation history between the parties makes EcoFactor's untimely disclosures particularly egregious. For example, EcoFactor has been asserting similar patents against the same ecobee accused products for three years, in two separate ITC investigations and across several district court litigations. Thus, EcoFactor had an advantage that most plaintiffs do not enjoy, because when it served its contentions and undertook discovery in this matter, EcoFactor and its experts had already conducted thorough investigations of ecobee's accused products and the relevant prior art. EcoFactor nevertheless chose not to disclose all of its theories. The Court should strike these untimely infringement and secondary considerations-related theories.

## II.     Factual Background

### A.  -00078 Litigation Timeline

On January 31, 2020, EcoFactor filed its complaint initiating the -00078 litigation accusing ecobee of infringing four patents, only one of which—U.S. Patent No. 8,738,327 ("the '327 Patent")—remains in the case. *See* Case No. 6:20-cv-00078 ("-00078 docket"), D.I. 1. On February 3, 2021, EcoFactor served its Final Infringement Contentions in the -00078 litigation, which included claim charts for the '327 Patent. *See* Ex. 1 ['327 Claim Chart]. Fact discovery in the -00078 litigation closed in September 2021. *See* -00078 docket, D.I. 63, 78. At no point did EcoFactor request leave to amend its Final Infringement Contentions.

2

On September 27, 2021, EcoFactor initially served the Zeidman Report, which it later corrected on October 13, 2021.

On July 25, 2022, the -00078 Litigation was consolidated into the lead -00428 litigation. *See* -000428 docket, D.I. 41.

**B.   -00428 Litigation Timeline**

On April 28, 2021, EcoFactor filed its complaint initiating the instant -00428 litigation accusing ecobee of infringing four patents, three of which remain in the case:  U.S. Patent Nos. 8,740,100 ("the '100 Patent"); 8,751,186 ("the '186 Patent"); and 10,584,890 ("the '890 Patent"). *See* D.I. 1. On September 14, 2021, EcoFactor served its preliminary infringement contentions. ecobee served its preliminary invalidity contentions on November 16, 2021.

On March 1, 2022, the Court entered its scheduling order.  D.I. 31.  The order included the following requirement for Final Infringement Contentions:

> Deadline to serve Final Infringement and Invalidity Contentions. **After this date, leave of Court is required for any amendment to infringement or invalidity contentions.** This deadline does not relieve the parties of their obligation to seasonably amend if new information is identified after initial contentions.

*See* D.I 31 at 2-3 (emphasis added).

The Court held its Markman hearing on March 22, 2022 (*see* D.I. 37), and fact discovery opened on March 23, 2022.  *See* D.I. 38 at 3.

On May 10, 2022, EcoFactor served its Final Infringement Contentions and ecobee served its Final Invalidity Contentions.  On October 11, 2022, Fact Discovery closed.  On November 7, 2022, EcoFactor served the de la Iglesia Report, and on December 6, 2022, EcoFactor served the Palmer Report.

███████████████████████████
██████████████████

### C. Mr. de la Iglesia's Untimely Infringement Opinions

#### 1. '100 Patent

The '100 Patent's asserted claims are directed to selecting between two delay interval settings to reduce the usage of a ventilation system. *See* Ex. 2 ['100 Patent] at claim 1(a) ("a thermostatic controller having *at least two settings for a delay enforced by said thermostatic controller* after said thermostatic controller turns said ventilation system off prior to allowing said thermostatic controller to signal said ventilation system to turn on again . . ."); 1(e) ("evaluate one or more parameters including at least the outside temperature measurements and the predicted rate of change, and *to determine whether to adopt said first interval or said second interval* based upon the values of said parameters"); 9(e) ("determining which of *at least a first interval and a second interval is to be enforced as a delay* by said thermostatic controller in light of at least the outside temperature measurements and the predicted rate of change, wherein said second interval is longer than said first interval.") (emphases added).[1]

In its Final Infringement Contentions for the '100 Patent, EcoFactor disclosed a theory that the patent is practiced by alleged ventilation delay intervals corresponding to ecobee's initiation of precooling periods in advance of a Time of Use or Community Energy Savings event.[2] Specifically, EcoFactor contended that:

> As an example, a longer **delay** between off and on will occur if **pre-cooling** begins closer to the high-demand period.  For example, .

*See* Ex. 3 ['100 Claim Chart] at 6-7 (emphases added).  Following this description, EcoFactor

---

[1] Unless otherwise indicated, all emphases are added.
[2] EcoFactor also refers to Community Energy Savings events as Demand Response events.

███████████████████████████
███████████████████

copied and pasted excerpts from ecobee websites and documents to support this pre-cool initiation-based delay interval theory.

Notably, EcoFactor did not assert any theory that the patent was practiced by the thermostat's ██████████████ *HVAC or compressor minimum off times*—a feature that is entirely unrelated to the Time of Use and Community Savings Event features that were disclosed. Further, none of the included excerpts from ecobee websites and documents (referenced above) discuss HVAC or compressor minimum off times.   In fact, the '100 Patent claim chart in EcoFactor's Final Infringement Contentions includes screenshots from an ecobee website related to thermostat settings (*see* Ex. 3 ['100 Claim Chart] at 24-25, 89-90), but EcoFactor specifically excluded the portion of that website discussing "compressor minimum cycle off time."  *See* Ex. 4 [EF-0667070 – Threshold settings for ecobee thermostats] at EF_0667075.   In sum, nothing in EcoFactor's Final Infringement Contentions notified ecobee that functionality relating to compressor minimum off-times was being accused of infringing the '100 Patent.

Nonetheless, the de la Iglesia Report sets forth an entirely new infringement theory for the '100 Patent, which for the first time identifies the ecobee thermostats' alleged default HVAC minimum off time as practicing the required ventilation delay intervals.  *See* Ex. 5 [de la Iglesia Report] at ¶ 473 ("For example, each ecobee thermostat ████████████████████ imposes a default HVAC minimum on time of 300 seconds (5 minutes) and ***minimum off time of 300 seconds (5 minutes)***, and each thermostat supports eco+ features that include Demand Response optimization (which ecobee sometimes refers to as 'Community Energy Savings'). ***This minimum off time*** is an example of the claimed first setting for a first interval (in this case, 5 minutes)."). Mr. de la Iglesia also, for the first time, identified an alleged minimum off time during Demand Response periods as practicing the required ventilation delay interval. *See id.* ("ecobee also

███████████████████
████████████

*imposes maximum on and minimum off times during Demand Response periods*. **This minimum off time** is an example of the claimed second setting for a second interval and can be longer than the first interval (e.g., 30 minutes rather than 5 minutes).").   Mr. de la Iglesia's opinions with respect to these minimum off times were not disclosed in EcoFactor's Final Infringement Contentions, and EcoFactor did not seek leave to amend its contentions at any point prior to serving the de la Iglesia Report.

### 2.   '890 Patent

The asserted claims of the '890 Patent include a limitation requiring "receiv[ing] geo-positioning data from the location-aware mobile device and automatically adjust[ing] a temperature value based on the geo-positioning data, including initiating at least one cooling or heating cycle for the HVAC system when the geo-positioning data is determined to indicate that the building is unoccupied by the user."  *See* Ex. 6 ['890 Patent] at limitation 1[1].

In its Final Infringement Contentions for the '890 Patent, EcoFactor (at best) identified specific occupancy detection functionality as practicing limitation 1[l]: i.e., the functionality referred to in the de la Iglesia Report as "non-Autopilot geofencing."  In the Final Infringement Contentions' disclosure regarding limitation 1[l], EcoFactor included screenshots of public ecobee websites that discuss occupancy detection features.  *See* Ex. 7 ['890 claim chart] at 118-80. EcoFactor states that "ecobee's website provides detailed instructions on how to set up and use these geofencing capabilities through the ecobee app and various smart home integrations."  *See id.* at 118.  In the over 60 pages of screenshots that follow, the word AutoPilot appears only two times—and is not discussed in any detail.  *See id.* at 121, 180.  The claim chart contains no explanation that AutoPilot has any connection to, much less that it is the functionality accused of infringing limitation 1[l].

████████████████████████
████████████████

It is also noteworthy that AutoPilot is *not* a feature of ecobee's accused thermostat products. Rather, it is a home security service, with functionality that includes automatic arming and disarming of security technology.

At no point did EcoFactor seek to amend its infringement contentions to add AutoPilot geofencing as an accused feature in this litigation. This is despite the fact that EcoFactor did seek leave to amend its infringement contentions with respect to limitation 1[l] of the '890 Patent ***on other, unrelated grounds***.[3] *See* Ex. 8 [Amended '890 claim chart] at 181-82.

Fact discovery closed on October 11, 2022. After fact discovery closed, EcoFactor requested additional discovery from ecobee regarding the AutoPilot smart security feature.[4] Although ecobee, at first, complied with EcoFactor's belated discovery requests in an effort to avoid burdening the Court, it soon became clear that EcoFactor was not legitimately seeking follow-up from pre-existing discovery, but rather it was trying to manufacture a whole new infringement theory based around AutoPilot. EcoFactor moved to compel production of additional AutoPilot discovery. *See* Ex. 10 [November 1, 2022 Joint Chart Setting Forth Discovery Disputes] at Issue #2. On November 3, 2022, the Court denied EcoFactor's motion to compel, and an order to that effect was entered shortly thereafter. *See* D.I. 59.

---

[3] On September 20, 2022, EcoFactor moved to amend its infringement contentions for '890 limitation 1[l], (*see* D.I. 45), which the Court allowed following a stipulation between the Parties. (D.I. 52). EcoFactor's amended infringement contentions did not change the scope of EcoFactor's literal infringement contentions at all, nor provide any new disclosure of an infringement theory based upon AutoPilot. Instead, EcoFactor's new contentions merely added a doctrine of equivalents theory that also does not relate to AutoPilot, or even mention the word AutoPilot at all. *See* Ex. 8 [Amended '890 claim chart] at 181-82.

[4] On May 19, 2022—nearly two months after fact discovery opened in this matter and after serving its Final Infringement Contentions—EcoFactor served its first set of discovery requests on ecobee. Those interrogatories included a definition of the term "accused feature or functionality" that incorporated a laundry list of functionalities, but even that expansive definition did not list "AutoPilot" as an accused feature or functionality. Ex. 9 [EcoFactor Interrogatories] at 5-6. EcoFactor did not even attempt to serve a single discovery request related to AutoPilot until September 9, 2022, one month before the close of fact discovery.

On November 7, 2022, EcoFactor served the de la Iglesia Report.  Mr. de la Iglesia provided opinions that two different technologies practice limitation 1[l]: "non-AutoPilot geofencing"—i.e., the geofencing that arguably was referenced in the Final Infringement Contentions—and, for the first time, "AutoPilot geofencing," which absolutely was not referenced in the Final Infringement Contentions.  *See* Ex. 5 [de la Iglesia Report] at ¶¶ 318, 320.  Specifically, Mr. de la Iglesia defines "non-AutoPilot geofencing" as "geofencing with Android mobile devices (via the Android ecobee mobile app), with iOS mobile devices (via the iOS ecobee mobile app), and with mobile devices running third-party home integration apps (such as IFTTT)."  *See id.* at ¶ 318.  These are the types of occupancy detection functionalities that EcoFactor did accuse of infringing in its infringement contentions for '890 limitation 1[l].  *Compare id.* at pages 404-35 *with* Ex. 8 [Amended '890 Final Infringement Contentions Chart] at 119-57 (showing identical evidence for non-AutoPilot geofencing contained in both EcoFactor's infringement contentions and the de la Iglesia Report).

In contrast, Mr. de la Iglesia defines "AutoPilot geofencing," which he asserts also may be referred to as Enhanced Smart Away, as "a feature that ecobee uses for presence detection, both in the context of automatically changing thermostat settings based on geofencing and in the context of home security (e.g., automatically arming the customer's home security system when the customer is away from the home)."  *See* Ex. 5 [de la Iglesia Report] at ¶ 320.  Mr. de la Iglesia's opinions regarding "AutoPilot geofencing" were not disclosed in EcoFactor's infringement contentions.  *See, e.g.*, *id.* at pages 436-44 (citing to publicly available ecobee webpages regarding AutoPilot and Smart Security, none of which were previously cited in EcoFactor's contentions).

███████████████████████
███████████████

### D.  Mr. Zeidman's Untimely Opinions Regarding the '327 Patent

On February 3, 2021, EcoFactor served its Final Infringement Contentions for the '327 Patent.  *See* Ex. 1 ['327 Claim Chart].  In its '327 claim chart, EcoFactor asserted doctrine of equivalents infringement theories for limitation 1[b] and dependent claim 2 of the '327 Patent.  *See* Ex. 1 ['327 Claim Chart] at 33, 115.  However, EcoFactor did not assert any doctrine of equivalents arguments for limitation 1[c] of the '327 Patent.  *See id.* at 33-59.[5]   EcoFactor did not request leave to amend its Final Infringement Contentions, which was required after the February 3, 2021 contentions deadline. *See* -00078 docket, D.I. 27 at 2.

On September 27, 2021, EcoFactor served the Zeidman Report, wherein Mr. Zeidman asserted for the first time a theory that limitation 1[c] of the '327 Patent was met under the doctrine of equivalents.  *See* Ex. 12 [Zeidman Report] at ¶ 108.

### E.  Dr. Palmer's Untimely Opinions Regarding Secondary Considerations

As noted above, on September 14, 2021, ecobee served its preliminary invalidity contentions in the -00428 matter.  On May 10, 2022, ecobee served its final invalidity contentions.[6]

In ecobee's first set of interrogatories to EcoFactor (Ex. 15 [ecobee's first set of interrogatories]), Interrogatory No. 17 requested:  "State whether EcoFactor contends there are

---

[5] EcoFactor included an immaterial boilerplate sentence that applied to all four then-asserted patents—"To the extent literal infringement of a claim element is not found, EcoFactor also contends that the claim element is infringed or has been infringed under the Doctrine of Equivalents." Ex. 11 [Contentions Cover Pleading] at 4.  Nothing in this boilerplate language actually discloses the substance of a Doctrine of Equivalents theory.

[6] In both its preliminary and final invalidity contentions, ecobee set forth invalidity theories based upon the ecobee SMART thermostat for the '890 Patent.  *See, e.g.*, Ex. 13 [Exhibit A-46 to final invalidity contentions] at 1 ("Claims 1-6 and 9-17 of the '890 patent are anticipated and/or rendered obvious by the ecobee Thermostats alone or in combination with any of the other references identified in these contentions, including those in Exhibit B hereto.").  To the extent that Dr. Palmer was implying at his deposition that Dr. D'Andrade's offering of an obviousness theory based upon the ecobee SMART thermostat necessitated Dr. Palmer's new opinions regarding secondary considerations, that obviousness theory was not new.  *See* Ex. 14 [Palmer Dep.] at 59:15-60:4.

secondary considerations that should be considered by the Court in connection with its

determination pursuant to 35 U.S.C. § 103 of the validity of any of the claims of the Asserted

Patents, and if the answer is anything other than an unqualified negative, identify each such

secondary consideration and describe in detail EcoFactor's contentions with respect to each such

secondary consideration." *Id.* at pg. 11.

The entirety of EcoFactor's response to contention Interrogatory No. 17 regarding the

secondary considerations of long-felt need, failure by others, and industry skepticism is set forth

below:

> Long-felt need and failure by others: The patented inventions solved long-felt, but
> unresolved needs of the HVAC and smart thermostat industries.  Indeed, the
> inventors for each patent sought out solve tough problems that were inherent to
> those industries, as the background sections of the Patents and other documents
> make clear. Though the asserted patents are from different specifications with
> different teachings, they reveal several problems in programmable thermostat and
> electronic HVAC control processes in the mid-to-late 2000s.  Due to limitations in
> the interface and other circuitry of then-existing electronic digital programmable
> thermostats, their significant theoretical savings are rarely realized.  And like the
> mechanical thermostats that preceded them, the programmable thermostat and
> electronic HVAC controls had a limited number of different input signals—usually
> just ambient temperature and the preset desired temperature.  And while reducing
> the delay to reach a present desired temperature, the amount of preconditioning
> required by existing programmable thermostats and other HVAC controls led to
> increased and inefficient energy usage.
>
> Moreover, this need is exemplified and further confirmed by the fact that the
> Asserted Patents have been cited by patent applicants and inventors that were still
> trying to solve the same problems in later-filed patent applications—including
> later-filed applications filed by Defendant.  Moreover, the industry, including
> various experts and persons of ordinary (or even extraordinary) skill were still
> trying to solve these problems years after the respective priority dates of the claimed
> inventions at issue here. Additional exemplary evidence, supporting one or more of
> these points for various asserted claims, these points can be found in the Asserted
> Patents, their respective file histories and other exemplary documents.

*See* Ex. 16 [EcoFactor Sept. 9 Resp. to First Set of Interrogatories] at 37-38.  Notably, in its

interrogatory response, EcoFactor did not identify a single document or statement as being relevant

to a single claim of the Asserted Patents.  Moreover, EcoFactor's response fails to disclose any theories of long-felt need, failure of others, or industry skepticism related to occupancy detection, geo-fencing, or even the '890 Patent at large.  Instead, EcoFactor merely identifies: (1) the background sections of the Asserted Patents that allegedly "reveal several problems in programmable thermostat and electronic HVAC control processes in the mid-to-late 2000s,"; (2) citations to the Asserted Patents in later-filed applications; and (3) that "[unnamed] various experts and persons of ordinary (or even extraordinary) skill were still trying to solve these problems years after the respective priority dates of the claimed inventions at issue here." *Id.*

On October 4 and 7, 2022, EcoFactor served supplemental responses to ecobee's first set of interrogatories.  However, EcoFactor did not supplement its response to contention interrogatory no. 17.  On October 11, 2022, fact discovery closed.

On November 7, 2022, ecobee served the Expert Report of Brian D'Andrade, Ph.D., P.E., CCNP, Regarding Invalidity of US Patents 8,740,100, 8,751,186, 10,584,890 (the "D'Andrade Report").  Regarding secondary considerations of non-obviousness, Dr. D'Andrade provided his opinions rebutting the secondary considerations that EcoFactor had set forth in its response to Interrogatory No. 17.  *See* Ex. 17 [D'Andrade Report] at ¶¶ 1124-40.

On December 6, 2022, EcoFactor served the Palmer Report.  In the Palmer Report, for the '890 Patent, Dr. Palmer set forth pages of new opinions regarding the secondary considerations of long-felt need, failure by others, and industry skepticism that were entirely absent from EcoFactor's response to interrogatory no. 17.  *See, e.g.*, Ex. 18 [Palmer Report] at ¶¶ 567-79, 673-85, 741-753, 804-13.  Dr. Palmer includes detailed new opinions regarding the alleged motivations and efforts by ecobee, as well as non-parties such as EnergyHub, Nest, Honeywell, Schneider Electric, Daikin, and Johnson Controls, to develop and implement occupancy detection and geo-

fencing features for their thermostats, despite the alleged long-felt need for such a feature. *See id.*
Much of Dr. Palmer's evidence to support his newly advanced theory is publicly available
information that had long been available to EcoFactor.

At his December 16, 2022 deposition, Dr. Palmer was specifically asked about the timing
of his new opinions regarding long-felt need, failure by others, and industry skepticism.  Dr.
Palmer testified as follows:

> Q. Okay. Turn back, then, to the original paragraphs that we were looking at,
> starting at paragraph 567.  And can you describe for me at a high level generally
> where you got the evidence that was -- that's presented in this subsection of your
> report.  And by that, I really mean, did you research this and pull it independently
> or was it provided to you by counsel?
>
> A. This information generally was provided to me by counsel.
>
> Q. Do you know when you first received this information from counsel?
>
> A. During the preparation of the report, in the two weeks prior to December 6 of
> 2020.

Ex. 14 [Palmer Dep. Tr.] at 60:5-19.    Thus, the timing of EcoFactor's late disclosures was
impacted by counsel.

### III.    Legal Standard

The purpose of infringement contentions is "to 'require parties to crystallize their theories
of the case early in the litigation' so as to 'prevent the shifting sands approach to claim
construction.'" *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1364 (Fed. Cir.
2006) (quoting *Atmel Corp. v. Info. Storage Devices, Inc.*, No. C 95-1987 FMS, 1998 WL 775115,
at *2 (N.D. Cal. Nov. 5, 1998)).   "'[E]xpert infringement reports may not introduce theories not
previously set forth in infringement contentions.'" *Pisony v. Commando Constructions, Inc.*, Case
No. 6:17-cv-00055-ADA, 2020 WL 4934463, at *1 (W.D. Tex. Aug. 24, 2020) (quoting *ROY-G-*

██████████████████████

*BIV Corp. v. ABB, Ltd.*, 63 F. Supp. 3d 690, 699 (E.D. Tex. 2014)). "Ultimately, '[t]he critical question in deciding whether to strike portions of an expert report ... is whether the expert has permissibly specified the application of a disclosed theory or impermissibly substituted a new theory altogether.'" *Id.* (quotations omitted).

Under Rule 26(e)(1), a party who has responded to an interrogatory must supplement or correct its response "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1). The supplementation requirement applies with equal force to contention interrogatories. *See Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1280 (Fed. Cir. 2012). If a party fails supplement its interrogatory responses with newly learned information, the party is not allowed to use that information "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

In determining whether to permit or strike new and untimely expert opinions, "the Fifth Circuit directs courts to consider (1) the offending party's explanation for the untimeliness; (2) the importance of the amendment or evidence that might be excluded; (3) the potential prejudice to the movant; and (4) the availability of a continuance to cure any prejudice." *See Biscotti, Inc. v. Microsoft Corp.*, No. 2:13-CV-01015-JRG-RSP, 2017 WL 2267283, at *2 (E.D. Tex. May 24, 2017); *see also Semcon IP Inc. v. MediaTek Inc.*, No. 2:16-cv-00437-JRG-RSP, 2018 WL 4501871, at *4-5 (E.D. Tex. Feb. 28, 2018).

## IV.    Argument

The Court should strike the new and untimely opinions first disclosed in the de la Iglesia, Zeidman and Palmer Reports.

██████████████████████████

████████████████

### A. Mr. de la Iglesia's New Opinions Regarding HVAC Minimum Off Times Should Be Stricken

Prior to serving the de la Iglesia Report, EcoFactor never sought leave to amend its Final Infringement Contentions to add an infringement theory accusing technology concerning HVAC or compressor minimum off times of practicing the '100 Patent. This newly advanced infringement theory for the '100 Patent is distinct from EcoFactor's timely disclosed theory— which solely involved allegations that ecobee's initiation of pre-cooling in advance of Time of Use or Demand Response practiced the '100 Patent.

EcoFactor has no valid reason for delaying asserting its new infringement theory for the '100 Patent until the de la Iglesia Report. The ███████████ default minimum off time upon which Mr. de la Iglesia relies is an old feature that EcoFactor has known about for a long time. Indeed, the exact ecobee documentation describing the compressor minimum off time that Mr. de la Iglesia now relies on (*see* Ex. 5 [de la Iglesia Report] at page 736) was used by EcoFactor as a deposition exhibit as far back as June 5, 2020—and then again on August 18, 2021. *See, e.g.*, Ex. 19 [Malchiondo June 5, Dep. Ex. 15] at ecobee00195477-78. Moreover, as discussed above, EcoFactor's Final Infringement Contentions include screenshots from portions of an ecobee webpage that discussed the ███████████ minimum off time that Mr. de la Iglesia now relies upon, **but EcoFactor chose to omit from its contentions all portions of the webpage that referenced the minimum off time**. It is, thus, clear that EcoFactor has no basis for first raising Mr. Iglesia's new theory after the close of fact discovery.

Notably, Mr. de la Iglesia is still also asserting EcoFactor's original, timely-disclosed pre-cooling-based infringement theory. Accordingly, Mr. de la Iglesia's theory is merely supplemental—which further supports striking it. *See Sycamore IP Holdings LLC v. AT&T Corp.*,

Case No. 2:16-CV-588-WCB, 2017 WL 4517953, at *4 (E.D. Tex. Oct. 10, 2017); *Biscotti*, at *4 ("Biscotti's new theory does not seem critically important because Biscotti may rely on the theories in its Infringement Contentions.").

Furthermore, allowing EcoFactor's attempted end-run around the rules governing discovery and disclosure would unfairly prejudice ecobee.  Here, EcoFactor waited until *after* the close of fact discovery to assert its new minimum off time-based theory, and thus deprived ecobee an opportunity to conduct discovery into this infringement theory and assess invalidity defenses based upon this theory. *See Sycamore*, 2017 WL 4517953, at *5 ("[T]he prejudice that typically flows from allowing an opposing party to disregard pretrial timing requirements [is] the party's loss of an opportunity to use discovery to explore the opposing party's theories and the loss of time to develop responses to those theories.").

The only way to attempt to minimize the prejudice to ecobee caused by EcoFactor's improper conduct would be to derail the case schedule—where the Parties are on the eve of serving pre-trial disclosures and proceeding towards trial in March 2023.  *See* D.I. 31.  EcoFactor has had ample time to build its case.  The Court should strike Mr. de la Iglesia's new infringement theory for the '100 Patent and the Parties should proceed on an orderly schedule towards trial.  *See Semcon*, 2018 WL 4501871, at *5 (striking theories where "the case has proceeded toward trial and any continuance would disrupt much of the pretrial work that has already been done").

### B.  Mr. de la Iglesia's New Opinions Regarding AutoPilot Should Be Stricken

As with his analysis of the '100 Patent, the de la Iglesia Report's new and untimely "AutoPilot geofencing" infringement theory for the '890 Patent should also be stricken.  As discussed above, EcoFactor's final infringement contentions related exclusively to "non-AutoPilot geofencing."  AutoPilot—a home security service, not a thermostat or HVAC feature—has never

been accused of infringement in this case.  Mr. de la Iglesia nevertheless advances, for the first time, an undisclosed theory that AutoPilot's use of geofencing infringes the '890 Patent.  Mr. de la Iglesia's AutoPilot-based theory should be stricken.

EcoFactor has no valid reason for its delay.  EcoFactor never accused AutoPilot of infringing during fact discovery, and it waited until after fact discovery was closed to begin manufacturing a theory that AutoPilot may infringe.  Moreover, Mr. de la Iglesia relies on both public information and information that ecobee produced well-before the close of fact discovery to support his theory.  *See, e.g.* Ex. 5 [de la Iglesia Report] at pages 436-44 (citing to a number of printouts of ecobee website support pages discussing AutoPilot); 447-49 (citing to a number of documents discussing AutoPilot with bates-prefix "ecobee" that were produced in connection with earlier litigations, and readily available to EcoFactor here under a cross-use agreement).  Accordingly, EcoFactor was aware of the AutoPilot feature before the close of fact discovery, but only began pivoting to an AutoPilot-as-infringing theory as fact discovery was closing, because its existing infringement theories were failing.  Thus, EcoFactor has no justifiable reason for failing to accuse "AutoPilot-geofencing" of infringing the '890 Patent until service of the de la Iglesia Report.

Notably, Mr. de la Iglesia is still also asserting EcoFactor's originally accused "non-AutoPilot geofencing"-based infringement theory of infringing the '890 Patent in his expert report.  This further supports striking the newly disclosed theory.  *See Sycamore*, at *4 (E.D. Tex. 2017); *Biscotti*, 2017 WL 2267283, at *4 ("Biscotti's new theory does not seem critically important because Biscotti may rely on the theories in its Infringement Contentions.").

Allowing EcoFactor to assert infringement theories against "AutoPilot geofencing" would unfairly prejudice ecobee.  Here, EcoFactor's untimely accusation deprived ecobee of the

opportunity to conduct discovery into this infringement theory and assess invalidity defenses based upon this theory.  For example, because AutoPilot is a smart security offering, ecobee could have refined its prior art search to include smart security technologies that operate in a manner similar to AutoPilot.

Also, as discussed above, there is no availability for a continuance without derailing the case schedule, which also weighs in favor of striking EcoFactor's untimely theory.

### C.  Mr. Zeidman's New Doctrine Of Equivalents Opinions Should Be Stricken

EcoFactor's new doctrine of equivalents arguments contained in the Zeidman Report with respect to claim limitation 1[c] of the '327 Patent should be stricken as untimely.  ecobee is unaware of any newly discovered evidence or other developments in the -00078 case that would have justified these new infringement theories, and even if EcoFactor did have good cause, it was required to seek leave of the Court to amend its Final Infringement Contentions.  There is no justification for EcoFactor to assert these new theories almost seven months after service of its Final Infringement Contentions and after the close of discovery.  *See Biscotti*, 2017 WL 2267283, at *4 (citing *iFLY Holdings LLC v. Indoor Skydiving Germany Gmbh*, No. 2:14-CV-1080-JRG-RSP, 2016 WL 3745572, at *4 (E.D. Tex. Mar. 25, 2016)) ("Contentions are meant to put an accused infringer on notice of the patentee's theory of infringement and to prevent litigation by ambush."); *see also Arterbury v. Odessa Separator, Inc.*, No. 5:16-cv-00183-RWS-RSP, 2019 WL 6700978, at *1-2 (E.D. Tex. Jan. 22, 2019).

Moreover, EcoFactor's new doctrine of equivalents arguments are back-up theories, as literal infringement is still asserted against the claim limitation at issue. *See, e.g.*, Ex. 12 [Zeidman Report] at ¶¶ 94-109. Conversely, ecobee will suffer prejudice if Mr. Zeidman is permitted to testify regarding these untimely doctrine of equivalents theories because it would have conducted

17

additional fact discovery into these new theories.  For example, Mr. Zeidman asserts that this limitation is met by the function/way/result test, yet ecobee did not have an opportunity to conduct discovery into Mr. Zeidman's contentions regarding the specific alleged functions, ways, and results he identifies in his report.  ecobee would have also conducted additional prior art searches directed to these doctrine of equivalents arguments EcoFactor now relies upon.

To the extent EcoFactor argues that its boilerplate reservation of rights in its Final Infringement Contentions (Ex. 11, at pg. 4) provided adequate notice to ecobee of its new doctrine of equivalents arguments, district courts have repeatedly rejected such arguments. *Sycamore*, 2017 WL 4517953, at *3 (collecting E.D. Tex. cases rejecting boilerplate reservation of rights to assert doctrine of equivalents arguments at later time); *Biscotti*, 2017 WL 2267283, at *4 ("blanket or boilerplate statement (not tied to any particular claim element) such as 'any element not literally met is met by the doctrine of equivalents'" are insufficient to survive a motion to strike). Accordingly, EcoFactor's new doctrine of equivalents infringement theory contained in the Zeidman Report should be stricken.

### D. Dr. Palmer's New Opinions Regarding Long-felt Need, Failure by Others, and Industry Skepticism Should Be Stricken

The Palmer Report includes new and untimely opinions regarding the secondary considerations of long-felt need, failure by others, and industry skepticism for the '890 Patent, which should be stricken as unjustifiable and prejudicial.

Here, as discussed above, ecobee served a contention interrogatory directly asking EcoFactor to "describe in detail" its contentions regarding secondary considerations of non-obviousness.  EcoFactor responded to that contention interrogatory with a high-level answer regarding long-felt need, failure by others, and industry skepticism that: (1) did not provide any

specific theories; (2) did not cite any specific documents or evidence as supporting any of EcoFactor's alleged theories; and (3) did not identify any specific features or claims of the Asserted Patents to which EcoFactor's alleged theories pertained.  For example, EcoFactor merely disclosed its position that "the industry, including various experts and persons of ordinary (or even extraordinary) skill were still trying to solve these problems years after the respective priority dates of the claimed inventions at issue here."   Ex. 16 [EcoFactor Sept. 9 Resp. to First Set of Interrogatories] at 38.  EcoFactor did not identify who those unnamed experts and persons of ordinary skill were, what projects they were working on, or the timeframe associated with their work.

However, after ecobee served the D'Andrade invalidity report, which rebutted EcoFactor's deficient secondary considerations contentions, EcoFactor served the Palmer rebuttal report, which asserted brand new opinions for the '890 Patent regarding the secondary considerations of "long-felt need, failure by others, and industry skepticism."  Namely, the Palmer Report includes pages of detailed opinions regarding the alleged motivations and efforts of companies such as ecobee, EnergyHub, Nest, Honeywell, Schneider Electric, Daikin, and Johnson Controls to implement geofencing features in their products.  EcoFactor never supplemented its interrogatory responses prior to the close of fact discovery to address these secondary considerations theories, and thus they should be stricken.  *See Pavo Solutions LLC v. Kingston Technology Company, Inc.*, No. 8:14-cv-01352-JLS-KES, 2019 WL 8138163, at *22 (C.D. Cal. Nov. 20, 2019) ("Visser may not testify on a secondary consideration that Kingston's expert did not have the opportunity to address because of Pavo's failure to supplement its interrogatory responses.  To rule otherwise would render contention interrogatories useless.")

19

Dr. Palmer's extensive reliance on public information only highlights that EcoFactor has no valid reason for its delay in raising them.  In fact, Dr. Palmer testified that EcoFactor's counsel did not even provide him with this old, public information until two weeks before the deadline to serve rebuttal expert reports.  Ex. 14 [Palmer Dep. Tr.] at 60:5-19.  If anything, rather than a justified delay, this conduct in combination with EcoFactor's late-disclosed "AutoPilot" infringement theory highlights that EcoFactor did not take seriously its discovery obligations with respect to the '890 Patent.  The Court should not condone this behavior by allowing EcoFactor the opportunity to ambush ecobee with new theories during expert discovery.

Further, any impact that excluding EcoFactor's newly disclosed secondary considerations theories may have on EcoFactor's validity case does not compare to the prejudice to ecobee if Dr. Palmer's untimely opinions are allowed.  *See Semcon*, 2018 WL 4501871, at *5 ("Although secondary considerations may be important, the prejudice to MediaTek is significant, particularly because Semcon did not disclose the facts it already had knowledge of upon which it would rely.  Dr. Carbonell's rebuttal opinion regarding secondary considerations therefore left MediaTek without an adequate means to develop a response, including any response that would require discovery.").  Here, Dr. Palmer's untimely secondary considerations opinions are especially prejudicial because they were not raised until after ecobee had already served its invalidity expert report.  Thus, ecobee has been deprived of an opportunity both to conduct fact discovery into Dr. Palmer's secondary considerations allegations, and to have Dr. D'Andrade provide his expert opinion regarding the same.

As discussed above, there is no availability for a continuance to address Dr. Palmer's new theories without derailing the case schedule.  His new opinions should be stricken.[7]

## V.    Conclusion

For the reasons discussed above, the Court should strike the new and untimely infringement and validity opinions of EcoFactor's experts.


Dated: December 30, 2022                    Respectfully submitted,

                                            */s/  Jennifer Parker Ainsworth*
                                            Jennifer Parker Ainsworth
                                            Texas State Bar No. 00784720
                                            WILSON, ROBERTSON & CORNELIUS, P.C.
                                            909 ESE Loop 323, Suite 400
                                            Tyler, Texas 75701
                                            Telephone: (903) 509-5000
                                            Fax: (903) 509-5092
                                            jainsworth@wilsonlawfirm.com

                                            Timothy J. Carroll
                                            Steven M. Lubezny
                                            VENABLE LLP
                                            227 West Monroe Street, Suite 3950
                                            Chicago, IL 60606
                                            Telephone: (312) 820-3400
                                            Fax: (312) 820-3401
                                            TJCarroll@Venable.com
                                            SMLubezny@Venable.com

---

[7] The untimeliness of these secondary consideration opinions is just one issue with Dr. Palmer's opinions rebutting ecobee's asserted obviousness theories and motivations to combine.  For example, at his deposition, Dr. Palmer testified his obviousness analysis was inconsistent with settled legal principles.  As one example, Dr. Palmer would not agree that he applied an expansive and flexible approach in his obviousness analysis, particularly with respect to the motivation to combine references.  *See* Ex. 14 [Palmer Dep.] at 22:17-23:21.  Thus, Dr. Palmer's analysis directly contradicts the standard for an appropriate obviousness analysis.  *See KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 415 (2007).

████████████████████████████
███████████████

Manny J. Caixeiro
VENABLE LLP
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone: (310) 229-9900
Fax: (310) 229-9901
MJCaixeiro@Venable.com

Megan S. Woodworth
VENABLE LLP
600 Massachusetts Ave NW
Washington, DC 20001
Telephone: (202) 344-4507
Fax: (202) 344-8300
MSWoodworth@Venable.com

Daniel A. Apgar
VENABLE LLP
1290 Avenue Of The Americas
New York, NY 10104
Telephone:  (212) 218-2209
Fax: (212) 218-2100
DApgar@Venable.com

*Attorneys for Defendant*

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that counsel for Defendant and Plaintiff met and conferred on December 28, 2022 but could not reach an agreement to resolve the issues.

*/s/ Jennifer P. Ainsworth*
Jennifer P. Ainsworth

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was filed electronically UNDER SEAL and served by e-mail on December 30, 2022, to all counsel of record.

*/s/ Jennifer P. Ainsworth*
Jennifer P. Ainsworth