**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| ECOFACTOR, INC., | |
| Plaintiff, | Case No. 6:20-cv-00078-ADA |
| v. | **JURY TRIAL DEMANDED** |
| ECOBEE, INC., | |
| Defendant. | |
| ECOFACTOR, INC., | |
| Plaintiff, | Case No. 6:21-cv-00428-ADA |
| v. | **JURY TRIAL DEMANDED** |
| ECOBEE, INC., | **LEAD CASE** |
| Defendant. | |

**DEFENDANT'S *DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF**
**PLAINTIFF'S DAMAGES EXPERT, MR. DAVID KENNEDY**

███████████████████████████████
        ██████████████████████

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 1

SUMMARY OF MR. KENNEDY'S OPINIONS AND METHODOLOGY ............................... 2

ARGUMENT ...................................................................................................... 7

   1.  Mr. Kennedy Fails to Apportion the Value of Any Asserted Patent ................................. 7

   2.  Mr. Kennedy Repeats the Methodological Flaw that Caused the Federal Circuit To Deem His Testimony Unreliable in the *Wi-Lan* Case ................................................ 10

   3.  Mr. Kennedy Mischaracterizes the DSJ Agreements as Creating an Established Royalty of ████ Per Unit for the Asserted Patents........................................................ 12

   4.  Mr. Kennedy Speculates About Daikin, Schneider and Johnson's Intent ....................... 14

   5.  Mr. Kennedy Used an Improper Hypothetical Negotiation Date for the '890 Patent ...... 16

CONCLUSION................................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Apple Inc. v. Wi-Lan Inc.*,
   25 F.4th 960 (Fed. Cir. 2022) ...................................................................................10, 11, 12

*Bell v. State Farm Lloyds Co.*,
   No. 4:21-cv-00636-O, 2022 WL 3331284 (N.D. Tex. May 9, 2022).....................................12

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)................................................................................................ i, 1, 12, 16

*Ericsson, Inc. v. D-Link Sys., Inc.*,
   773 F.3d 1201 (Fed. Cir. 2014)................................................................................................7

*Finalrod IP, LLC v. John Crane, Inc.*
   No. 2020-1865 (Fed. Cir. Mar. 1, 2021) ...............................................................................16

*In re Foxomax Products Liability Litig.*,
   645 F. Supp.2d 164 (S.D.N.Y. 2009)......................................................................................14

*Laser Dynamics, Inc. v. Quanta Comput., Inc.*,
   694 F.3d 51 (Fed. Cir. 2012)...............................................................................................7, 16

*Moore v. Int'l Paint, L.L.C.*,
   547 Fed. Appx. 513 (5th Cir. 2013)........................................................................................12

*Network-1 Technologies, Inc. v. Alcatel-Lucent USA, Inc.*,
   No. 2017 WL 4173468 (E.D. Tex. Sept. 21, 2017) ...............................................................13

*Omega Patents, LLC v. Calamp Corp.*,
   13 F.4th 1361 (2021)..............................................................................................7, 8, 9, 10

*Power Integrations, Inc. v. Fairchild Semiconductor, Int'l, Inc.*,
   904 F.3d 965 (Fed. Cir. 2018)...................................................................................................7

*Trell v. Marlee Elec's Corp.*,
   912 F.2d 1443 (Fed. Cir. 1990)...............................................................................................13

*VirnetX, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 130 (Fed. Cir. 2014)...................................................................................................7

**Other Authorities**

Asserted Patents. 2022 ...............................................................................................4, 5

Federal Rules of Evidence Rule 702 ...............................................................................1

U.S. Patent No. 10,534,382...................................................................................1, 4

U.S. Patent Nos. 8,738,327 .............................................................................1, 2, 12

██████████████████████████████████████████████

████████████████████████████

Defendant ("ecobee") respectfully submits this motion under Rule 702 of the Federal Rules of Evidence, *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and the Orders of this Court, to exclude the opinions of plaintiff's ("EcoFactor") expert, Mr. David Kennedy, concerning damages for the alleged infringement of the Asserted Patents (i.e., U.S. Patent Nos. 8,738,327 (the "'327 Patent"), 8,740,100 (the "'100 Patent"), 8,751,186 (the "'186 Patent") and 10,854,890 (the "'890 Patent")).[1]

## INTRODUCTION

The testimony of EcoFactor's damages expert, Mr. Kennedy, should be excluded because he employs methodologies the Federal Circuit has rejected, relies on a false understanding of the pertinent facts, and uses unreliable methods to produce an opinion.  Mr. Kennedy's damages opinion is that, regardless of which patent or combination of patents ecobee may infringe, it is required to pay a royalty of ████ per unit.  Mr. Kennedy does not know how the ████ rate was calculated, and he has not performed those calculations himself.  Rather, he relies on two sources for the ████ rate: (1) self-serving statements by EcoFactor's CEO that he would not accept less than ████ to license a patent, even though he has, and (2) license agreements that EcoFactor previously entered.  The relevant license agreements, however, cover EcoFactor's *entire portfolio*

---

[1] On September 28, 2021, Mr. Kennedy submitted an expert report concerning damages for the two patents then at issue in the -78 case: the '327 Patent and U.S. Patent No. 10,534,382 ("'382 Patent").  On November 8, 2021, Mr. Kennedy submitted a "corrected" version of that report (the "2021 Report," attached hereto as Exh. A).  The '382 Patent was subsequently dismissed in light of the decision by the PTAB in an *inter partes* review, which found the asserted claims to be unpatentable. *See* -78 Dkt. No. 144.  The -78 case was subsequently consolidated with the -428 case, which involves the '100 Patent, '186 Patent and '890 Patent. *See* -428 Dkt. No. 41.  Pursuant to the consolidation order, on October 18, 2022, Mr. Kennedy submitted a supplement to his 2021 Report (attached hereto as Exhibit B), which contained an updated damages calculation for the '327 Patent using the same methodology as set forth in his 2021 Report.  On November 7, 2022, Mr. Kennedy submitted an expert report (the "2022 Report") concerning damages for the '100, '186 and '890 Patents, which is attached hereto as Exh. C. Mr. Kennedy was deposed on November 9, 2021 (the "2021 Tr.," highlighted transcript excerpts attached as Exh. D) and December 20, 2022 (the "2022 Tr.," highlighted transcript excerpts attached as Exh. E).  Should the Court wish to review the entirety of Exhibits D or E, ecobee would be happy to submit them.

of approximately 40 patents and say nothing about the value of any particular patent within the portfolio—much less the value of the specific patents asserted in this case.  And, in each license agreement, the parties agreed to a lump sum—not the supposed ███ royalty rate that Mr. Kennedy espouses.

Mr. Kennedy thus fails to properly apportion the damages value of any Asserted Patent, and his "one size fits all" approach to damages was recently rejected by the Federal Circuit. Moreover, Mr. Kennedy *mischaracterizes* the substance of the agreements he relies upon, improperly *speculates* about the licensees' intent and uses an *incorrect* hypothetical negotiation date.  EcoFactor should not be allowed to present Mr. Kennedy's unreliable opinions to the jury. ecobee respectfully asks the Court to exclude his testimony.

### SUMMARY OF MR. KENNEDY'S OPINIONS AND METHODOLOGY

In calculating damages, Mr. Kennedy applies a ███ per-unit royalty rate that was supposedly included in license agreements that EcoFactor entered into with Daikin Industries, Ltd. ("Daikin") (Exh. F hereto), Schneider Electric USA, Inc. ("Schneider") (Exh. G hereto) and Johnson Controls Inc. ("Johnson") (Exh. H hereto) (collectively, the "DSJ Agreements").  The DSJ Agreements were entered into in settlement of EcoFactor's assertion of nine patents[2] against Daikin, Schneider and Johnson in two ITC Investigations and multiple district court litigations. *See id.* Only one of the four Asserted Patents was included among the DSJ Asserted Patents: the '327 patent was one of seven patents asserted against Daikin and Schneider (but not Johnson).

---

[2] EcoFactor asserted the following U.S. patents against Daikin and Schneider:  8,131,497; 8,180,492; 8,412,488; 8,423,322; 8,498,753; the '327 Patent, and 10,534,382.  2022 Report (Exh. C) at ¶¶ 312, 318. EcoFactor asserted the following U.S. patents against Johnson: 8,423,322; 8,019,567, 10,612,983, and 8,886,488. *Id.* at ¶ 325.   The patents asserted against Daikin, Schneider and Johnson are collectively referred to as the "DSJ Asserted Patents."

███████████████████████████████████████████████████████
████████████████████████████

In each of the DSJ Agreements, EcoFactor provided a license to its ***entire patent portfolio*** in exchange for a single, one-time, ***lump sum payment***.  *See* Exh. F at §§ 1.4 & 3.1, Exh. G at §§ 1.4 & 3.1; Exh. H at §§ 1.4 & 3.1.  None of the DSJ Agreements provide for the payment of a per-unit or running royalty.  Nor, in any of the DSJ Agreements, does the licensee agree to a particular royalty rate (much less a ████ royalty rate) for any specific patent or patents.  *See, e.g.*, 2022 Tr. (Exh. E) at 181:9-12 ("Q. Where in this agreement that they signed did Schneider say yes, we agree ████ is the right amount?  Point me to that language, please.  A.  That language is not in the agreement."); 182:16-24.  Mr. Kennedy emphasizes the DSJ Agreements' WHEREAS recital in which EcoFactor—and *only* EcoFactor—expresses that it "████████████████████████ ████████████████████████████████████████████ ████████" Exh. F at 1 (third WHEREAS clause) (emphasis added); Exh. G at 1; Exh. H at 1. However, as described above, none of the licensees agreed to a pay a ████ royalty or that ████ was used to calculate the lump sum.  In fact, Schneider and Daikin specifically stated that their lump sum payments ████████████████████████████████████ Exh. F § 3.1; Exh. G § 3.1.   Schneider went even further and included language that "██████████ ████████████████████████████████████████████ ███████████████." Exh. F at 1 (third WHEREAS clause).

It is undisputed that none of the DSJ Agreements ascribe a particular value or royalty rate (████ or otherwise) to any specific patent, much less to any of the Asserted Patents. 2022 Tr. (Exh. E) at 182:25-183:17.  Nevertheless, Mr. Kennedy opines that the DSJ Agreements create an established royalty of ████ for the Asserted Patents.  *See* 2021 Report (Exh. A) at ¶¶ 228-234, 278, 283-284, 304-310; 2022 Report (Exh. C) at ¶¶ 395-399.  Mr. Kennedy also, at times, treats the DSJ Agreements as comparable licenses that lead to the conclusion that a ████ royalty would

have been agreed to in a hypothetical negotiation concerning the Asserted Patents in this case.  *See, e.g.*, 2022 Report (Exh. C) at ¶¶ 459-460, 472, 479.

Mr. Kennedy uniformly applies the supposed ▮▮▮ rate for infringement of any Asserted Patent without considering the distinctions and differences among the Asserted Patents.  ***The same rate applies no matter how many Asserted Patents are infringed, which Asserted Patents are infringed, or what combination of the Asserted Patents are infringed***.  2022 Tr. (Exh. E) at 127:8-13 ("Q.  Now let's talk about a scenario where three patents out of the four are found infringed.  Does it matter which three for purposes of what royalty rate applies in your analysis?  A. No, I don't believe so."); 128:16-129:25.   Thus, under Mr. Kennedy's theory, if ***any*** asserted patent is infringed it independently justifies 100% of the ▮▮▮ royalty rate; but if that patent is not infringed the royalty is not reduced at all.  *See, e.g., id.* at 113:15-114:23.  For example, in his 2021 Report, Mr. Kennedy applies a ▮▮▮ rate for a license to both the '327 and '382 Patents (Exh. A at ¶¶ 317-318), but after the '382 Patent was deemed invalid and dismissed from this case he did not reduce the royalty rate or the damages calculation in his 2021 Report (or, for that matter, in his 2022 Report).  *See also* 2021 Tr. (Exh. D) at 91:16-92:3.

Nor does Mr. Kennedy account for any differences in value between the Asserted Patents here and the DSJ Asserted Patents which drove the value of the DSJ Agreements.  In fact, when performing the hypothetical negotiation in this case based on the DSJ Agreements, he does not ascribe any value to any of the DSJ Asserted Patents.  *See, e.g.*, 2022 Tr. (Exh. E) at 115:16-116:2; 117:2-119:4.

Mr. Kennedy also did nothing to separate or apportion the value of the four Asserted Patents (or any of them individually) from the value of the many other patents that were licensed in the portfolio-wide DSJ Agreements.   Even though he relies on the portfolio-wide DSJ

4

███████████████████████████████████████████
        ████████████████████████

Agreements, Mr. Kennedy could not recall how many patents were in EcoFactor's portfolio, much less has he reviewed those patents.[3]  *See* 2022 Tr. (Exh. E) at 153:6-11.  Mr. Kennedy admits that *he "ha[s] not placed a specific value on any individual patents" in EcoFactor's portfolio*.  *Id.* at 153:12-19.  This includes the Asserted Patents.  And, at his deposition, Mr. Kennedy agreed that it was his "opinion that no adjustment [to the royalty rate in the DSJ Agreements] is warranted due to the fact that there are patents in [the DSJ Agreements] that are not at issue here…."  2021 Tr. (Exh. D) at 97:22-98:2.

Notably, while espousing a ████ per-unit rate, Mr. Kennedy does not know why ████, as opposed to █████████, is the "correct" royalty rate.  He believes ████ has some relationship to the DSJ Agreements' lump sum payment amounts and the number of covered product (perhaps that each agreement's lump sum divided by the number of covered products might equal ████), but he cannot verify that because does not know the amount of product sales that were covered for any particular licensee.  *See* 2022 Tr. (Exh. E) at 175:1-9, 175:20-25, 178:17-21; 2021 Tr. (Exh. D) at 96:13-97:8; 106:19-108:6.  Mr. Kennedy also relies on EcoFactor's CEO's unilateral belief that ████ is an appropriate rate, but he does not know how EcoFactor and its CEO arrived at that number or what it represents.  *See* 2022 Tr. (Exh. E) at 161:8-21, 162:13-163:15; 167:8-15 ("Correct, I don't know how they arrived at that number based on the analysis.  I don't have that confidential information.").  Mr. Kennedy claims that EcoFactor's CEO would not accept less than ████, but the CEO did not explain to Mr. Kennedy how the ████ figure was calculated.  *See id.*; *see also* 2021 Tr. (Exh. D) at 101:3-21.   Although Mr. Kennedy asked the CEO how the ████ was calculated, the CEO would not answer because he claimed it was based on "confidential

---

[3] EcoFactor's patent portfolio consisted of approximately 35 patents and 17 patent applications.  *See* 2021 Tr. (Exh. D) at 85:22-86:1TRANE0000136-137 (Exh. I hereto) at 137.

████████████████████████████████████████████
██████████████████████████

information"—and Mr. Kennedy did not pursue the matter any further.  2022 Tr. (Exh. E) at  163:1-165:19, 166:16-167:7).

Thus, at its core, Mr. Kennedy's methodology is simple:  if ecobee infringes any of EcoFactor's patents, or any combination of EcoFactor's patents, it has to pay ████ because EcoFactor believes—for undisclosed reasons—that is the appropriate rate.  It doesn't matter to Mr. Kennedy which patents are infringed.  It doesn't matter to Mr. Kennedy how many patents are infringed.  It doesn't matter to Mr. Kennedy that he doesn't know how the ████ was calculated. It doesn't matter to Mr. Kennedy that the only licenses he points to were portfolio-wide licenses driven by different patents.  It doesn't matter to Mr. Kennedy that those were lump licenses where the licensee did not agree to a ████ rate.  In Mr. Kennedy's view, any infringement simply must yield the ████ royalty EcoFactor inexplicably views as appropriate.

The vast majority of Mr. Kennedy's reports exist to distract from his lack of rigorous methodology.  For example, Mr. Kennedy discusses ecobee's internal surveys (*see* 2022 Report (Exh. C) at ¶¶ 175-207), which he references throughout his supposed apportionment analysis (*see id.* at ¶¶ 216-226).  Taking his "analysis" at face value, Mr. Kennedy, at most, apportions between the entire value of broad multi-component feature sets that contain allegedly infringing technology and the value of the other feature sets in the Accused Products.  *See, e.g., id.* at ¶ 223 (apportioning "features and characteristics of the Accused Products that are *correlated to* the patents in suit from those that are not" and apportioning between "Accused and non-Accused Eco+ *features*") (emphasis added).  However, Mr. Kennedy never apportions down to the ***patent*** level or identifies the apportioned value of any Asserted Patent.   Nor does his analysis of the surveys play any role in the (non-existent) apportionment between the Asserted Patents and the dozens of other patents in the portfolio that was licensed in the DSJ Agreements.  Moreover, Mr. Kennedy claims that

███████████████████████████████████████████
██████████████████████████

ecobee's survey results somehow support the ██████ royalty rate, but he never quantifies that

support or ties those survey results to the ██████ rate.  For example, Mr. Kennedy claims that the

survey results would create "upward pressure" that would "offset" the fact that the DSJ patents are

portfolio licenses, but he never quantifies the amount of that upward pressure or the offset. 2022

Tr. (Exh. E) at 195:2-19.  His discussion of surveys is, thus, window dressing that plays no

meaningful or quantifiable role in his analysis.

**ARGUMENT**

**1.     Mr. Kennedy Fails to Apportion the Value of Any Asserted Patent[4]**

Mr. Kennedy admits that he ***"ha[s] not placed a specific value on any individual patents"***

***in EcoFactor's portfolio***.  2022 Tr. (Exh. E) at 153:12-19.  This includes the Asserted Patents.  As

such, he has not distinguished between: (1) the value of one Asserted Patent from the other

Asserted Patents, or (2) the value of any single patent in EcoFactor's portfolio—including any of

the Asserted Patents—from the dozens of others that were licensed in the DSJ Agreements for,

supposedly, ██████ per unit.  His opinion is, thus, agnostic as to which patent(s) have been infringed

and the specific characteristics and value of that patent or patents.

---

[4] As the Court knows, apportionment relates to the concept that "the patentee must in every case give evidence tending to separate or apportion … the patentee's damages between the patented feature and the unpatented features …." *Laser Dynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). Principles of apportionment require that "[n]o matter what the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 130, 1326 (Fed. Cir. 2014).  "[W]here multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).  Thus, "[w]hen the accused infringing products have both patented and unpatented features, measuring this value requires a determination of the value added by such features." *Id.*  Moreover, "[e]ven when a damages theory relies on the smallest salable unit as the basis for calculating the royalty, the patentee must estimate what portion of that smallest salable unit is attributable to the patented technology when the smallest salable unit itself contains several non-infringing features." *Power Integrations, Inc. v. Fairchild Semiconductor, Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018).

While Mr. Kennedy does not come out and say so, he can only be using a form of "built-in apportionment" that was rejected by the Federal Circuit in *Omega Patents, LLC v. Calamp Corp.*, 13 F.4th 1361 (2021), because it fails to distinguish the value of the asserted patents from the value of other patents in the plaintiff's portfolio.  In *Omega Patents,* the plaintiff's damages theory was predicated on several comparable licenses which, it contended, had "built-in apportionment."  *Omega Patents*, 13 F.4th at 1376-77.   "Built-in apportionment effectively assumes that the negotiators of a comparable license settled on a royalty rate and royalty base combination embodying the value of the asserted patent." *Id.* at 1377.

In the district court, Omega advocated for a $5.00 per-unit royalty rate, based largely on testimony from Omega's president that "the licensing fee was 'five dollars [per unit] whether it's one patent or 50 patents.'" *Id.* at 1379.  Omega's president elaborated that "'[no] particular patent [is] treated as more valuable than another' and that Omega's policy was 'one price for all'" *Id.* (quoting the record).   Omega's expert therefore opined that "whether it's one patent or all the patents, the way that Omega licenses them is five bucks," and the defendant "should pay the same rate no matter how many claims or how many of the patents it infringes." *Id.*

The Federal Circuit rejected this approach because "Omega's theory would permit it to obtain a particular royalty rate merely by relying on its internal 'policy' without regard to comparability—under the proffered licensing arrangement, Omega sought the same licensing fee *regardless* of what patents were included or what technology was covered."  *Id.* (emphasis in original).  Thus, Omega sought "to hide behind its generic licensing arrangement to avoid the task of apportionment." *Id.*

More fundamentally, the Federal Circuit held, "absent evidence of a comparable license or comparable negotiation to support an identical $5.00 rate for a one-patent license to the [asserted]

'278 patent, we fail to see how this patent/claim independent approach accounts for apportionment." *Id.* The Federal Circuit recognized that "allegedly comparable licenses may cover more patents than are at issue in the action … ." *Id.* at 1380. "But Omega was nonetheless required to 'account for such distinguishing facts when invoking [the licenses] to value the patented invention.'" *Id., quoting Ericsson*, 773 F.3d at 1227. Omega and its expert failed to adequately perform such an apportionment. "Most glaringly, each of the eighteen proffered licenses involves numerous patents, in contrast to a hypothetical negotiation for a single-patent license." *Id.* Although Omega contended that its expert had accounted for additional patents in the license agreements, the Federal Circuit found that the expert had "merely *identified*" the fact that the portfolio license was broader than the patents in suit, but, "[w]hat's utterly lacking is evidence that Omega met its obligation to 'account for such distinguishing facts' in invoking the licenses to value the [asserted] '278 patent." *Id.* at 1381.

Mr. Kennedy's analysis is materially indistinguishable from the *Omega Patents* expert's opinion. As in *Omega Patents*, he has applied a static royalty rate (here, ███) no matter which patents, or how many patents, are infringed—based on the rationale that asserted patents drive all of the value and the remainder of the portfolio is thrown into the license for no additional charge. Also as in *Omega Patents*, Mr. Kennedy has attempted to justify his use of the rate by relying on (1) statements from the plaintiff's CEO as to the minimum amount plaintiff would accept in a negotiation, and (2) prior, comparable, licenses entered into by the plaintiff to license its entire portfolio. As in *Omega Patents*, however, Mr. Kennedy made no meaningful attempt to distinguish between the value of the various patents in the plaintiff's licensed portfolio—nor, specifically, to separate out the value of the Asserted Patents from the value of the rest of the portfolio. Tellingly, the patents which drove 100% of the value of the DSJ License Agreements

are not given any value in Mr. Kennedy's damages analysis here.  2022 Tr. (Exh. E) at 115:16-116:2; 117:2-119:4; 119:23-120:15.

Mr. Kennedy made no serious and methodologically sound effort at apportionment.  His 2021 Report does not even purport to contain an apportionment analysis and only mentions the word "apportionment" three times (2021 Report (Exh. A) ¶¶ 227, 250, 312)—and in one of those instances (*id.* ¶ 312) he discusses apportionment as something ecobee would have requested in a hypothetical negotiation but that EcoFactor would have refused (*see id.* ¶ 313).  In any event, in both the 2021 Report and the 2022 Report, Mr. Kennedy did nothing to distinguish the value of each Asserted Patent from the dozens of other patents in the portfolio that was licensed to Daikin, Schneider and Johnson.  Nor did he distinguish the value of one Asserted Patent from other Asserted Patents.  He relies instead on a "one size fits all" approach of ███ if any one, two, three or four patents are infringed—regardless of which patent(s) are infringed.  This, as the Federal Circuit held in *Omega Patents*, does not satisfy an expert's apportionment obligation.

## 2.    Mr. Kennedy Repeats the Methodological Flaw that Caused the Federal Circuit To Deem His Testimony Unreliable in the *Wi-Lan* Case

Mr. Kennedy opines, based on his interpretation of the portfolio-wide DSJ Agreements, that a royalty rate of ███ applies regardless of whether ecobee is infringing any one or any combination of the patents in suit.  (2022 Tr. (Exh. E) at 113:15-114:23, 127:8-13, 128:16-129:25).  In so doing, Mr. Kennedy commits the same errors that the Federal Circuit identified when rejecting his analysis in *Apple Inc. v. Wi-Lan Inc.*, 25 F.4th 960 (Fed. Cir. 2022).

In *Wi-Lan*, Mr. Kennedy, testifying on behalf of plaintiff Wi-Lan, opined that three of Wi-Lan's prior license agreements were comparable.  *Wi-Lan*, 25 F.4th at 972.  Each agreement was a portfolio license that covered not only the patents being asserted against Apple, but also other patents in plaintiff's portfolio.  *Id.*  Mr. Kennedy contended that "only a handful of valuable patents

drive the royalty rate for a license, and the rest of the portfolio is included for a marginal upcharge."
*Id.*  Mr. Kennedy then "separated the value of the key patents from the rest of the licensed portfolio" by "reduc[ing] the [portfolio-wide] royalty rate by 25 percent."  *Id.*    In other words, Mr. Kennedy's royalty rate was the portfolio-wide rate, but with a 25% adjustment to account for all of the other non-asserted patents in the portfolio.

On appeal, the Federal Circuit held that Mr. Kennedy had committed "methodological and factual errors in analyzing the comparable license agreements."  *Id.* at 974.   Mr. Kennedy had opined that the asserted patents were among those that drove the value of the prior license agreements.  *Id.* at 972.    The Federal Circuit rejected this contention, holding that the prior "licenses treated the asserted patents as chaff, not wheat.  For example, there is no evidence that the [asserted] '757 patent was discussed during negotiations for any of the comparable licenses." *Id.*  "None of the licenses list the [asserted] '757 patent among the 'Asserted Patents,' which were the patents focused on during underlying negotiations."  *Id.*  Mr. Kennedy's opinion "should have been excluded"—and, therefore, the "district court abused its discretion in denying Apple's motion for a new trial on damages." *Id.* at 974.

In this case, as the table below illustrates, Mr. Kennedy has repeated the same errors that led the Federal Circuit to conclude his opinion should have been excluded in *Wi-Lan*.

| Mr. Kennedy's Opinion in *Wi-Lan* | Mr. Kennedy's Opinion Here |
|---|---|
| Based on comparable licenses of plaintiff that were for entire portfolios. | Based on comparable licenses of plaintiff that were for entire portfolios. |
| In the comparable licenses, "only a handful of valuable patents drive the royalty rate for a license, and the rest of the portfolio is included for a marginal upcharge,"  25 F.4th at 972. | "Although the final license may ultimately include other EcoFactor patents … the royalty EcoFactor receives is derived from those patents EcoFactor believes are infringed by the licensee.  Therefore, little to no value is assigned to other patents that may be included in the license."  (2022 Report (Exh. C) ¶ 306; |

███████████████████████████████
        █████████

| | *see also id.* at ¶¶ 331, 335-337; 2021 Report (Exh. A) ¶ 158). |
|---|---|
| Mr. Kennedy contended that the Asserted Patents in *Wi-Lan* were key to the value of the comparable license. | Mr. Kennedy contends that the DSJ Agreements establish a royalty for the Asserted Patents—an even stronger and closer relationship than the Asserted Patents being "key" to the license. |
| In fact, the patents driving the royalty rate in the comparable licenses (the "wheat" in the Federal Circuit's parlance) were different from the asserted patents. | In fact, the DSJ Agreements were driven by the DSJ Asserted Patents, not the '100, '186 and '890 Patents here. Although the '327 Patent was among the DSJ Asserted Patents as to Daikin and Schneider (but not Johnson), it is not differentiated from the many other patents asserted against those licensees. |
| In the comparable licenses, the patents asserted in the present litigation were not discussed and were treated as the "chaff" – i.e., they were part of the remainder of the portfolio that was thrown in for a marginal amount. | In the DSJ Agreements, Asserted Patents were not discussed (other than the fact that the '327 Patent was among multiple patents asserted against Daikin and Schneider) and no value was ascribed to any of the Asserted Patents; the '100, '186 and '890 Patents were part of the remainder of the portfolio that was thrown in for no particular amount. |
| Mr. Kennedy, in calculating damages, applies the rate for the full portfolio license in the comparable agreements (although he performs a 25% adjustment to account for all of the other patents in the portfolio, i.e., the "chaff"). | Mr. Kennedy, in calculating damages, applies the supposed ████ rate for the full portfolio in the DSJ Agreements (although, here, he does not even perform *any* discount to account for all of the other patents in the portfolio, i.e., the "chaff"). |

Mr. Kennedy's errors in *Wi-Lan* led the Federal Circuit to require a retrial. The Court should avoid the same result here and exclude his opinions at the *Daubert* stage.

### 3.    Mr. Kennedy Mischaracterizes the DSJ Agreements as Creating an Established Royalty of ████ Per Unit for the Asserted Patents

Mr. Kennedy opines, in part, that the DSJ Agreements *establish* ████ per unit as the royalty for the patents in issue. *See* 2021 Report (Exh. A) at ¶¶ 228-234, 278, 283-284, 304-310; 2022 Report (Exh. C) at ¶¶ 395-399. In so opining, Mr. Kennedy relies on a false and inaccurate recitation of the facts, which renders his opinion unreliable. *See Moore v. Int'l Paint, L.L.C.*, 547

Fed. Appx. 513 (5ᵗʰ Cir. 2013) ("Among the conditions imposed by the Federal Rules of Evidence on the admissibility of expert opinion testimony is that the testimony be 'based on sufficient facts or data'") (quoting Fed. R. Evid. 702(b)); *Bell v. State Farm Lloyds Co.*, No. 4:21-cv-00636-O, 2022 WL 3331284 (N.D. Tex. May 9, 2022) (damages expert's "methodology is inherently flawed because it is based on an inaccurate understanding of key facts, rendering [expert's] opinion unreliable.").

The DSJ Agreements plainly do not *establish* ▮ as a royalty for *anything*, much less for a license to the Asserted Patents. "For a royalty to be established, it 'must be paid by such a number of persons as to indicate a general acquiescence in its reasonableness by those who have occasion to use the invention.'" *Trell v. Marlee Elec's Corp.*, 912 F.2d 1443, 1446 (Fed. Cir. 1990) (quoting *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983)). Here, however, none of the DSJ Agreements involve a party agreeing to pay ▮ per unit as a royalty for any patent(s). Mr. Kennedy was forced to admit as much at his deposition. *See, e.g.*, 2022 Tr. (Exh. E) at 181:9-12 ("Q. Where in this agreement that they signed did Schneider say yes, we agree ▮ is the right amount? Point me to that language, please. A. That language is not in the agreement."); 182:16-24. Rather, in each DSJ Agreement, the agreed-upon royalty payment is a *lump sum* amount, paid in exchange for a license to EcoFactor's *entire portfolio* (Exh. F at § 3.1, Exh. G at § 3.1, Exh. H at § 3.1). Thus, to the extent the DSJ Agreements "establish" anything, it is that a lump sum payment as low as ▮ is acceptable for a license to EcoFactor's entire portfolio—not that a ▮ per-unit running royalty is required for a license to one or more Asserted Patents. It simply is untrue that ▮ was ever agreed to as a royalty rate for a license to the '100 patent, the '186 patent or the '890 patent (or any combination thereof).

████████████████████████████████████████████████████████

██████████████████████████

**4.      Mr. Kennedy Speculates About Daikin, Schneider and Johnson's  Intent**

It is improper for an expert to provide an opinion about a party's intent.  *See, e.g.*, *Network-1 Technologies, Inc. v. Alcatel-Lucent USA, Inc.*, No.  2017 WL 4173468, \*5 (E.D. Tex. Sept. 21, 2017) ("[A]lthough an expert may point to and even testify about evidence relevant to intent, he may not speculate about a party's intent."  This is because an expert's experience "does not give her the ability to read minds," rendering such opinion testimony "conjecture … [that] is not a proper subject for expert or even lay testimony."); *In re Foxomax Products Liability Litig.*, 645 F. Supp.2d 164, 165 (S.D.N.Y. 2009)  (excluding expert testimony of "knowledge, motivations, intent, [and] state of mind").

As discussed above, the DSJ Agreements do not contain an agreement by Dakin, Schneider or Johnson to a ████ per-unit royalty rate. No representatives of Daikin, Schneider or Johnson were deposed in this case, and even if their subjective intent in entering the DSJ Agreements were relevant there is no evidence of their subjective intent.  Mr. Kennedy seeks to overcome this evidentiary gap through ***speculation*** that Daikin, Schneider and Johnson intended to agree to a ████ royalty rate, that they strategically chose not to recite their (supposed) agreement to the ████ rate in the DSJ Agreements, and that their (supposed) agreement to the ████ rate was intended to be built into the lump sum payments.

Mr. Kennedy's speculation takes several forms.  For example, and without limitation, Mr. Kennedy opines about generic licensees' intent, followed by statements to the effect that Daikin, Schneider and Johnson acted in accordance with his view of generic licensees' intent.  *See, e.g.*, 2022 Report (Exh. C) ¶¶ 381 ("[T]here are no statements to indicate that Schneider and EcoFactor did not use ████ to derive the lump sum royalty Schneider paid to EcoFactor.  Based on my licensing experience, it is not surprising to me that Schneider ████████████████████████

██████████████████████████████████████████████████
███████████████████████████

████████ █████████████████ It is extremely common that parties to license agreements often

make statements ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████"), 382 ("█████████████████████████████████████████

██████████████████████████████████████████████████████████

██ ██████ ██████ ███████████████████████████████████████████

Based on my license experience, ████████████████████████████████████████

████████████ such a practice is an extremely common occurrence in the patent licensing

industry."), 390 ("Accordingly, Daikin, Schneider, and Johnson Control's agreement to take a

license followed their evaluation of ██████████████████████████████████████

████████████████████████."). In each of these examples, Mr. Kennedy does not have

knowledge of what factors actually drove Daikin, Schneider and Johnson to agree to the lump sum

amounts, or why they insisted that certain in the contracts (e.g., ██████ █████ ████████████

██████████████████████████). Instead, he discusses generic licensees' purported

intent based on his "licensing experience," and then improperly speculates that Daikin, Schneider

and Johnson acted in accordance with that supposed intent.

Elsewhere, Mr. Kennedy discusses EcoFactor's supposed intent in agreeing to the lump

sum payment, and ascribes the same intent to Daikin, Schneider and Johnson. *See, e.g.*, 2022

Report (Exh. C) ¶¶ 315 ("The lump-sum royalty was derived by applying a per unit royalty

calculation of █████ to Daikin's past and projected sales of products accused on infringement in

the Litigation."), 321 ("██████ Schneider ████████████████ █████ ███████████████████ it

does not contest the fact that █████ was used as the royalty rate to derive the lump sum payment

of ████.”), 328 (Johnson).  Even if it were true that the ████ rate factored into EcoFactor's

decision to settle at the lump sum amounts, that does not mean it factored into the licensees'

decision.  Mr. Kennedy simply speculates that the licensees went through the same analysis as

EcoFactor, but there is no factual support for this improper speculation.

5.    **Mr. Kennedy Used an Improper Hypothetical Negotiation Date for the '890 Patent**

"[T]he correct determination of the hypothetical negotiation date is essential for properly

assessing damages."  *LaserDynamics, Inc. v. Quanta Compute, Inc.*, 694 F.3d 51, 75 (Fed. Cir.

2012).  "Employing an incorrect hypothetical negotiation date results in a failure to consider the

relevant economic and market factors that drive the reasonable royalty analysis; any resulting

royalty would not reflect the value of the patents when the infringement began, which is the

overriding goal of any reasonable royalty analysis.  *See LaserDynamics*, 694 F.3d at 75-6.  Where,

as here, a damages expert uses the wrong hypothetical negotiation date it is appropriate to exclude

his testimony at the *Daubert* stage.  *See Finalrod IP, LLC v. John Crane, Inc.* No. 2020-1865 (Fed.

Cir. Mar. 1, 2021) (affirming W.D. Tex. Case No. 7:15-cv-00097-ADA's exclusion of damages

expert due to use of incorrect hypothetical negotiation date).

The date of the hypothetical negotiation is the date that the infringement began.

*LaserDynamics,* 694 F.3d at 75.  Mr. Kennedy uses a hypothetical negotiation date in November

2019 for all Asserted Patents.  *See* 2022 Report (Exh. C) ¶ 448.  However, the '890 patent had not

even issued at that time, so its alleged infringement could not have begun in November 2019.  *Id.*

at ¶ 447.  Rather, the '890 patent issued in March 2020.  Mr. Kennedy recognizes that "[i]t would

be possible to model two separate Hypothetical Negotiations," yet he inexplicably elects not do to

so based solely on the conclusory statement that "it would be reasonable for the parties at the

November 2019 Negotiation to consider that a related patent – the '890 Patent—would issue some

four months later and therefore decide to negotiate and agree [to] a reasonable royalty for all three patents in the same negotiation.  I will proceed on that basis here." *Id.* at ¶ 448.  That is the totality of Mr. Kennedy's "analysis" in this regard.

Mr. Kennedy's justification, besides being conclusory, is based on two falsehoods.  *First*, the '890 patent is not "related" to the '100 and '186 patents; they do not share a specification or derive from a common application.  *Second*, the application giving rise to the '890 patent substantially changed between its September 2019 publication and its issuance in March 2020. Indeed, published application US 2019/0285299 does not even mention "geo-positioning data" in its claims. Thus, ecobee could not have negotiated over the '890 patent in November 2019.

It was incumbent upon Mr. Kennedy to analyze whether there were material changes in the parties' positions and economic considerations between November 2019 and March 2020—but he does not do so.  And while ecobee has no obligation to prove such changes, it is clear there were material factors that Mr. Kennedy needed to consider.  For example, November 2019 was pre-Covid pandemic, whereas March 2020 was a time of acute economic unpredictability.  Moreover, by March 2020 it would have been clear to ecobee that EcoFactor was engaged in a multi-faceted and multi-jurisdictional patent assertion campaign, including the assertion of many patents in many different litigations (by which time EcoFactor had commenced actions over eight patents in the ITC, District of Massachusetts and the first of three litigations in Court).  Mr. Kennedy accounts for none of these factors.

## CONCLUSION

For the foregoing reasons, ecobee respectfully requests that Mr. Kennedy's testimony be excluded.

Dated: December 30, 2022                 Respectfully submitted,


                                         */s/  Jennifer Parker Ainsworth*
                                         Jennifer Parker Ainsworth
                                         Texas State Bar No. 00784720
                                         WILSON, ROBERTSON & CORNELIUS, P.C.
                                         909 ESE Loop 323, Suite 400
                                         Tyler, Texas 75701
                                         Telephone: (903) 509-5000
                                         Fax: (903) 509-5092
                                         jainsworth@wilsonlawfirm.com

                                         Timothy J. Carroll
                                         Steven M. Lubezny
                                         VENABLE LLP
                                         227 West Monroe Street, Suite 3950
                                         Chicago, IL 60606
                                         Telephone: (312) 820-3400
                                         Fax: (312) 820-3401
                                         TJCarroll@Venable.com
                                         SMLubezny@Venable.com

                                         Manny J. Caixeiro
                                         VENABLE LLP
                                         2049 Century Park East, Suite 2300
                                         Los Angeles, CA 90067
                                         Telephone: (310) 229-9900
                                         Fax: (310) 229-9901
                                         MJCaixeiro@Venable.com

                                         Megan S. Woodworth
                                         VENABLE LLP
                                         600 Massachusetts Ave NW
                                         Washington, DC 20001
                                         Telephone: (202) 344-4507
                                         Fax: (202) 344-8300
                                         MSWoodworth@Venable.com

Daniel A. Apgar
VENABLE LLP
1290 Avenue Of The Americas
New York, NY 10104
Telephone:  (212) 218-2209
Fax: (212) 218-2100
DApgar@Venable.com

*Attorneys for Defendant*

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that counsel for Defendant and Plaintiff met and conferred on December 28, 2022 but could not reach an agreement to resolve the issues.

*/s/ Jennifer P. Ainsworth*
Jennifer P. Ainsworth

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was filed electronically UNDER SEAL and served by e-mail on December 30, 2022, to all counsel of record.

*/s/ Jennifer P. Ainsworth*
Jennifer P. Ainsworth

19