████████████████████

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | |
|---|---|
| ECOFACTOR, INC. | |
| Plaintiff, | Case No. 6:20-cv-00078-ADA |
| v. | |
| ECOBEE, INC., | |
| Defendant. | |
| ECOFACTOR, INC. | |
| Plaintiff, | Case No. 6:21-cv-00428-ADA |
| v. | **JURY TRIAL DEMANDED** |
| ECOBEE, INC., | **LEAD CASE** |
| Defendant. | |

### PLAINTIFF ECOFACTOR, INC.'S OPPOSITION TO DEFENDANT'S *DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S DAMAGES EXPERT, DAVID KENNEDY

### TABLE OF CONTENTS

I. INTRODUCTION ......................................................................................... 1

II. FACTUAL BACKGROUND ...................................................................... 2

   A. Mr. Kennedy Relies on the $██ Royalty Rate Expressly Stated in Three Highly Comparable License Agreements ................................................................. 2

   B. EcoFactor's Experts Analyze Technology Covered By Each Patent-in-Suit And Establish That The Key Patents in the DSJ Agreements Cover Comparable Smart Thermostat Technology To The Patents-in-Suit ................................................. 4

   C. Mr. Kennedy's Comparable License Apportionment and Profit Apportionment Analyses. ........................................................................................................ 7

   D. Mr. Kennedy's Broader *Georgia-Pacific* Analysis And Conclusion ............................. 9

III. ARGUMENT ............................................................................................ 10

   A. Mr. Kennedy's Reasonable Royalty Opinion Is Supported By A Patent-Specific Apportionment Analysis That Accords With Evidence And Law. ........................... 10

      *1. Mr. Kennedy satisfies the Federal Circuit's requirements for "built-in apportionment" using highly comparable licenses.* .......................................... 10

      *2. Mr. Kennedy's apportionment analysis establishes the nexus between the technology covered by the DSJ Agreements and the Asserted Patents and apportions among them. ..* 11

      *3. Mr. Kennedy also apportions through his survey and profit apportionment analysis, which allows for apportionment of the value attributable to each of the patents-in-suit. ..* 13

      *4. Mr. Kennedy's opinions are distinguishable from Omega and Wi-LAN because they rely on specific evidence establishing the nexus between the key patents in the DSJ Agreements to the patents asserted against ecobee, including unrebutted technical opinions, and other evidence.* ............................................................... 14

   B. Mr. Kennedy does not argue that the per-unit rate from the DSJ Agreements is an "established royalty," and conducts a full *Georgia-Pacific* analysis as required under the law, although he does rely on ample evidence supporting that the per-unit rate from the DSJ Agreements would be a reasonable royalty for ecobee to pay. ............................... 16

   C. Mr. Kennedy's opinions do not rely on speculation about the licensee's intent, and in any event, ecobee's disagreements about the meaning or import of the evidence relied on by Mr. Kennedy goes to the weight of that opinion, which is not a basis for exclusion. ............. 18

   D. Mr. Kennedy Properly Opines That The Parties Would Conduct One Hypothetical Negotiation ................................................................................................... 19

IV. CONCLUSION ........................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Apple Inc. v. Wi-LAN Inc.*,
25 F.4th 960 (Fed. Cir. 2022) ........................................................................... 12, 15

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*,
967 F.3d 1353 (Fed. Cir. 2020) ......................................................................... 10, 11

*Elbit Sys Land & C4I Ltd. v. Hughes Network Sys., LLC*,
927 F.3d 1292 (Fed. Cir. 2019) ..................................................................... 10, 11, 15

*Finalrod IP, LLC v. John Crane, Inc.*,
No. 2020-1865 (Fed. Cir. Mar. 1, 2021) ................................................................. 19

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970) ....................................................................... 16

*GREE, Inc. v. Supercell Oy*,
No. 219CV00070JRGRSP, 2020 WL 4057640 (E.D. Tex., July 20, 2020) .......................... 12

*i4i Ltd. Partnership v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010) ............................................................................ 17

*Kumho Tire Co. Ltd. et al. v. Carmichael et al.*,
526 U.S. 137 (1999) ....................................................................................... 13

*LaserDynamics, Inc. v. Quanta Compute, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ............................................................................. 19

*Omega Pats., LLC v. CalAmp Corp.*,
13 F.4th 1361 (Fed. Cir. 2021) ........................................................................... 14

*Pavo Solutions LLC v. Kingston Tech. Co., Inc.*,
35 F.4th 1367 (Fed. Cir. 2022) ...................................................................... 11, 18

*ProTradeNet, LLC v. Predictive Profiles, Inc.*,
No. 6:18-CV-00038-ADA, 2019 WL 6499488 (W.D. Tex. Oct. 11, 2019) .......................... 17

*Summit 6, LLC v. Samsung Elec. Co., Ltd.*,
802 F.3d 1283 (Fed. Cir. 2016) ...................................................................... 13, 17

*Trell v. Marlee Elec's Corp.*,
912 F.2d 1443 (Fed. Cir. 1990) ........................................................................... 16

*United Food & Com. Workers Loc. 1776 v. Teikoku Pharma USA*,
296 F. Supp. 3d 1142 (N.D. Cal. 2017) .................................................................. 19

*Vectura Ltd. v. Glaxosmithkline LLC*,
981 F.3d 1030 (Fed. Cir. 2020) ........................................................................... 11

## I.      INTRODUCTION

EcoFactor, Inc. ("EcoFactor") respectfully opposes ecobee Inc. ("ecobee")'s Motion to Exclude the Testimony of EcoFactor's Damages Expert, David Kennedy ("Mot."). ecobee challenges Mr. Kennedy's reliance on the per-unit royalty rate set forth in three EcoFactor patent licenses, arguing the per-unit rate stated therein is uncorroborated, and that Mr. Kennedy failed to adjust for the fact that the licenses covered EcoFactor's entire portfolio. But ecobee's arguments ignore substantial evidence in the record that corroborates the per-unit rate (including not only the three separate license agreements, but also contemporaneous negotiation documents, and the sworn testimony of EcoFactor's CEO), and they also ignore extensive analysis by both Mr. Kennedy and EcoFactor's technical experts, Mr. Robert Zeidman and Mr. Erik de la Iglesia, accounting for similarities and differences between the comparable license agreements and the hypothetical negotiation with ecobee.  Remarkably, not only does ecobee fail to move to exclude these technical opinions, upon which Mr. Kennedy extensively and properly relies, but ecobee also fails to inform the Court that these opinions exist at all.

ecobee also claims Mr. Kennedy fails to apportion between and among the licensed patents and the patents-in-suit. But ecobee again entirely ignores EcoFactor's technical experts' extensive analysis mapping the patents-in-suit and the licensed patents to comparable technologies, products and features, thereby comparing the scope of the licensed patents to the scope of technology covered by the patents-in-suit.  Separately, Mr. de la Iglesia and Mr. Kennedy rely on surveys used by ecobee in its normal course of business to apportion to, and between, the patents-in-suit.  Based on these detailed apportionment and comparability analyses, Mr. Kennedy concludes that, in this case and on these facts, the parties to the hypothetical negotiation would agree to a $5.16 rate for each or all of the patents-in-suit.

████████████████████████████

ecobee's arguments are similar to those rejected by this Court in in *EcoFactor, Inc. v. Google LLC,* Case No. 6:20-cv-00075, Dkt. Nos. 114, 119, 137, 148, 256, 263, 269, 272.  Like Google, ecobee ignores the technical analyses underpinning much of Mr. Kennedy's opinions entirely, misrepresents what opinions they do address, and provides critiques of the evidence that go to the weight, rather than admissibility, of his opinions. ecobee's motion should be denied.

## II.    FACTUAL BACKGROUND

### A.    Mr. Kennedy Relies on the ███ Royalty Rate Expressly Stated in Three Highly Comparable License Agreements

One of the bases of Mr. Kennedy's opinions is the ███ per-unit rate expressly stated in EcoFactor's settlement and license agreements with Daikin Industries, Ltd., Schneider Electric USA, Inc. and Johnson Controls, Inc. (collectively, the "DSJ Agreements"). Ex. A, 2022 Report at ¶¶ 309-340, 380-383; Ex. C, 2021 Report at ¶¶176-192, 229-231, 305-316.[1]  There is no dispute in this case that each of the DSJ Agreements is highly comparable to the hypothetical negotiation. Both Mr. Kennedy and ecobee's own damages expert "agree that 'the Daikin, Schneider, and [JCI] licenses are "sufficiently comparable" to the Hypothetical License' for use in determining a reasonable royalty here. . . . [and] agree that '[e]ach of these three licenses covered the same technology areas that are at issue in this matter, they involved the same licensor, they were executed within one to two years of this Hypothetical Negotiation, . . . and they covered highly comparable products.'" Ex. 4, Expert Report of ecobee damages expert Melissa Bennis ("Bennis Rpt") at 120, quoting Kennedy's 2022 Report at 117-118.[2]  The parties disagree, however, on whether the most pertinent part of these agreements is the lump sum paid, or the language stating

---

[1] Lettered exhibits herein refer to exhibits attached to ecobee's Motion.  These include Mr. Kennedy's expert reports at Ex. A (the "2021 Report") concerning damages for the '327 patent, and Ex. C (the "2022 Report") concerning damages for the '890, '186, and '100 patents.
[2] Exhibit 1 to this Opposition Brief is an accompanying declaration by counsel for EcoFactor. Additional exhibits to this opposition are numbered and described in Exhibit 1.

██████████████████████████████

what rate was used to determine these lump sums.  Mr. Kennedy cites a wide range of evidence

to support his opinion that the ████ per-unit rate disclosed in the Agreements is the most relevant.

First, there are the agreements themselves, each of which explain how the lump sum

payment was calculated in a provision stating: ████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████ Ex. F at ECODCT_0001217, Ex. G at ECODCT

0001228, and Ex. H at ECODCT_0001239.  Second, Mr. Kennedy cites contemporaneous

negotiation documents confirming that the ████ per-unit rate was actually used by the parties to

calculate the lump sum, including e-mails between EcoFactor and the DSJ licensees in which

EcoFactor  proposed and calculated royalties based on ████ per unit, as well as emails from the

licensees ████████████████████████████████

██████████████████████████████████. *See, e.g.,*

2022 Report at ¶ 315 (n. 337), ¶¶ 328-329 (n. 363), ¶¶337-338 (n. 371, n. 372); Ex. 5

(ECODCT_0229373) (EcoFactor proposing ████ rate on future licensed sales); Ex. 6

(ECODCT_0229453) (EcoFactor proposing a ████ per unit, ████████████████

████████████); Exhibit 7 (ECODCT_0229572) (proposing a royalty based on sales of

accused products).  Third, EcoFactor's CEO, Shayan Habib, who approved and signed the

licenses, testified that ████ "represents the lowest amount EcoFactor would be willing to accept

for a royalty to its patented technology" and that the ████ rate was applied to past and projected

sales of products accused of infringement to calculate the lump sums in the licenses.  2022 Report,

¶¶ 315, 321, 328-329, 337-338; 2021 Report at ¶ 231, ¶ 305; Ex. 8, Sept. 15, 2021 Habib Dep. at

301:25-303:11; Ex. 9, Sept. 16, 2021 Habib Dep. at 324:17-325:1, 430:1-432:2.

██████████████████████████████

Notwithstanding this overwhelming evidence that the ███ per-unit rate was used to calculate the lump sums, ecobee emphasizes other provisions in the DSJ Agreements, such as where ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████. Mot. at 3. But Mr. Kennedy analyzes all these provisions, noting that they either do not contradict the statement in the license that ████ was the rate applied. 2022 Report at ¶¶ 321, 381-382. In any event, ecobee identifies no methodological flaw in a damages expert applying his expertise to opine on how the parties to the hypothetical negotiation would consider such evidence.

Similarly, ecobee points out that the number of units to which the ████ per unit rate was applied in these agreements, and the analysis through which EcoFactor determined ████ would be the minimum rate it would accept, is not in the record. Mot. at 5. However, Mr. Kennedy was not required to ignore all the evidence before him simply because other non-record evidence might exist. Nor is it uncommon for an expert to have evidence of the rate applied to calculate a lump sum without having evidence of the extent of use or sales by the licensee, or of how the licensor determined what rate to propose. For example, ecobee's own experts rely on ecobee licenses even though ecobee's witness on these licenses could not say, or was directed by counsel not to say, how much or even whether ecobee was using the licensed technology. *See, e.g.,* Ex 10 (2021 Banderk Dep.) at 29:9, 31:13, 41:23, 43:7.

### B. EcoFactor's Experts Analyze Technology Covered By Each Patent-in-Suit And Establish That The Key Patents in the DSJ Agreements Cover Comparable Smart Thermostat Technology To The Patents-in-Suit

ecobee argues that Mr. Kennedy failed to consider the "distinctions and differences" among patents licensed in the DSJ Agreements and between the licensed patents and the patents-in-suit in this case. Mot. at 4. However, Mr. Kennedy properly relies on EcoFactor's technical

experts, both to distinguish the Asserted Patents, and to account for differences between the scope of the licensed technology in the DSJ Agreements and at the hypothetical negotiation. Moreover, Mr. Kennedy also properly relies on the technical experts to apportion the benefits provided by the Asserted Patents from those provided by non-patented features, and to apportion those benefits between the Asserted Patents.

Mr. Kennedy developed an understanding from EcoFactor's technical experts EcoFactor's technical experts, Mr. Erik de la Iglesia and Mr. Robert Zeidman, as to what technologies are covered by each of the Asserted Patents (the '327, '890, '186, and '100 patents). Ex. 2, November 7, 2022 Expert Report of Erik de la Iglesia ("de la Iglesia Rpt.") ¶¶ 606-609; Ex. 3 September 27, 2021 Expert Report of Robert Zeidman ("Zeidman Rpt.") ¶¶ 433-435; 2022 Report, ¶¶ 84-117; 2021 Report, ¶¶ 75-81, 90-92.  These experts explain that the Asserted Claims cover three interrelated smart thermostat technologies: "HVAC Performance Modeling," "Demand Reduction," and "Smart Scheduling / Occupancy Detection." 2022 Report, ¶¶ 89, 92, 97, 104; 2021 Report, ¶ 306. For example, the Asserted Claims of the '186, '100, '327, and '890 Patents each cover HVAC Performance Modeling and Demand Reduction technologies, and the '890 Patent additionally covers Smart Scheduling / Occupancy Detection. 2022 Report, ¶¶ 92, 97, 104; 2021 Report, ¶ 306, ¶ 316.

EcoFactor's experts then applied these opinions on the scope of the Asserted Patents to analyze whether the technology licensed in the DSJ Agreements is comparable to the technology at issue in the hypothetical negotiation.  Although Messrs. Kennedy, Zeidman and de la Iglesia recognized that the DSJ Agreements are portfolio licenses, they analyzed evidence confirming that the focus of the DSJ Agreements was the patents asserted in the underlying litigations, defined in the agreements as the "Asserted Patents." Mot. at 2, n. 2; 2022 Report, ¶¶ 331-340; de



la Iglesia Rpt. ¶¶ 645-657; Zeidman Rpt. ¶¶ 432-435.  For example, the DSJ Agreements:

2022 Report, ¶¶ 309-340; 2021 Report, ¶¶ 176-192; Ex. F (Daikin) at 1-2, 10; Ex. G (Schneider)

at 1-2, 10; Ex. H (Johnson) at 1-2.

Focusing on the "DSJ Asserted Patents" that were, according to the evidence, the key

patents in the DSJ Agreements, Mr. Zeidman and Mr. de la Iglesia concluded that the DSJ

Asserted Patents fall into the same smart thermostat technology categories as the patents-in-suit,

*i.e.,* "HVAC Performance Modeling," "Smart Scheduling / Occupancy Detection," and "Demand

Reduction."  Zeidman Rpt. ¶¶ 432-435; de la Iglesia Rpt.  ¶¶ 645-657. The experts summarized

their results as follows:

| Smart Thermostat Technology | Patents Asserted Against ecobee | EcoFactor Patents Licensed By Daikin, Schneider | EcoFactor Patents Licensed By JCI |
|---|---|---|---|
| Smart Scheduling / Occupancy Detection / Presence Sensing | '890 Patent | 8,180,492 ("'492 Patent") 10,534,382 ("'382 Patent") 8,498,753 ("'753 Patent") | 10,912,983 ("'983 Patent") |
| HVAC Performance Modeling | '186 Patent '100 Patent '890 Patent | 8,783,327 ("'327 Patent") 8,412,488 ("'2488 Patent") 10,534,382 ("'382 Patent") 8,423,322 ("'322 Patent") 8,131,497 ("'497 Patent") 8,498,753 ("'753 Patent") | 8,019,567 ("'567 Patent") 8,886,488 ("'6488 Patent") 8,423,322 ("'322 Patent") 10,912,983 ("'983 Patent") |
| Demand Reduction | '186 Patent '100 Patent '890 Patent | 8,783,327 ("'327 Patent") 8,412,488 ("'2488 Patent") 10,534,382 ("'382 Patent") 8,498,753 ("'753 Patent") | 8,886,488 (the "'6488 Patent") |

*See* 2022 Report, ¶ 340; de la Igleisa Rpt. ¶657. As shown in this table, while there is significant

overlap, each of the Asserted Patents is separately categorized, and certain patents, such as the '890 Patent, have broader coverage than others. This analysis allows Mr. Kennedy, and the jury, to distinguish among the Asserted Patents and to contrast their scope with that of the DSJ Asserted Patents.  2022 Report, ¶¶ 339-340 (comparing '890, '100, and '186 patents to DSJ Asserted Patents); 2021 Report, ¶¶ 229, 306, 316 (comparing '327 to DSJ Asserted Patents).

Mr. Zeidman and Mr. de la Iglesia also compared the features of the smart thermostats made by Daikin, Schneider, and Johnson Controls, to the accused ecobee products and features, concluding that EcoFactor's allegations against these same smart thermostat technology features in the licensee products are comparable to the features of ecobee's smart thermostats that infringe the asserted patents in this case.  de la Iglesia Rpt. ¶¶ 658-665; Zeidman Rpt. ¶¶ 436-444.  Mr. Kennedy also conducted his own detailed economic comparability analysis based on market for and marketing of the licensed and accused products.  2022 Report, ¶¶ 331-379; 2021 Report, ¶¶ 229-230 (p. 57), 306, 316, 321-340 (pp. 77-88).

### C.      Mr. Kennedy's Comparable License Apportionment and Profit Apportionment Analyses.

Having established the correspondence between the patents and features in this case to the DSJ Agreements (2022 Report, ¶¶ 331-379), in his Factor 13 analysis on apportionment, Mr. Kennedy explains that the royalty rate that is set forth expressly in the DSJ Agreements already has "built-in apportionment" because "these three licenses covered the same technology areas that are at issue in this matter, they involved the same licensor, they were executed within one to two years of the hypothetical negotiation, they involved competitors competing in the same market, and they covered highly comparable products." 2022 Report, ¶ 429-430.

Mr. Kennedy also performed an "economic analysis of the profits that ecobee realizes from its sales of accused devices" based on ecobee surveys (2022 Report, ¶¶ 175-211) and

ecobee's profits (2022 Report, ¶¶ 225-226, Exhibit 8A) to apportion the benefits provided by the Asserted Patents from those provided by non-patented features, and to apportion those benefits between the Asserted Patents. 2022 Report, ¶ 431, referencing ¶¶ 212-228, 473-474, 480, 493-495, Exhibit 8A, Exhibit 8A.1, Exhibit 8B.  Mr. Kennedy's relies on Mr. de la Iglesia's analysis of ecobee surveys to determine which responses correspond to benefits attributable to the features covered by the Asserted Patents. de la Iglesia Rpt., ¶¶ 610-628; 2022 Report, ¶¶ 208-229; 2022 Report, ¶¶ 217-226.[3] Mr. Kennedy then applied the "resulting apportionment metric range" to "the per-unit Gross Profit that ecobee has earned on sales of the Accused Products over the Damages Period" to determine a fully-apportioned range of profits that represents the incremental benefit to ecobee from ecobee's infringement. 2022 Report, ¶¶ 225-228, 431; 473-474, 480.

This analysis also permitted Mr. Kennedy to apportion between each of the Asserted Patents, and to address what the royalty rate should be if only a subset of the Asserted Patents is found to be valid and infringed. 2022 Report, ¶¶ 227-228, 493-495. Mr. Kennedy acknowledges that the '890 patent enables additional ecobee features not covered by the other patents, including the accused Smart Scheduling / Occupancy Detection feature. *Id.* But Mr. de la Iglesia's survey analysis "allows separation of Responses that are correlated with the '890 Patent, but not with the '100 and '186 Patents," which allowed Mr. Kennedy to calculate an apportioned benefit that corresponds to only the '100 or '186 patents, versus the apportioned benefit where the '890 is one of the infringed patents. *Id.* ¶¶ 227-228, Exhibit 8A (includes '890), Exhibit 8A.1 (only includes '100 and '186, but not '890). This provides the jury with a way to apportion damages in the event of a finding that only the '890 Patent, or only the '186 Patent, is valid and infringed. *Id.* Notwithstanding these differences, however, Mr. Kennedy concludes that ecobee would still

---

[3] ecobee criticizes Mr. Kennedy's opinions on the surveys (Mot. at 6), but fails to move to exclude (or even mention) the de la Iglesia opinions on which Mr. Kennedy relies.

agree to pay the same per-unit rate if the jury finds any of the patents valid and infringed, because that is the approach consistent with the licensing evidence, and because the benefits to ecobee's profits from the use of any one of the patents is significantly greater than the per-unit rate set forth in the DSJ Agreements which already includes built-in apportionment. 2022 Report, ¶¶ 480, 493-495, Exhibit 8A, Exhibit 8A.1.

### D.    Mr. Kennedy's Broader *Georgia-Pacific* Analysis And Conclusion

ecobee's criticisms of Mr. Kennedy's reasonable royalty opinion ignore vast swaths of Mr. Kennedy's *Georgia-Pacific* analysis unrelated to the DSJ Agreements.  Mr. Kennedy notes that the survey analysis discussed above suggests the marginal benefit to ecobee from its infringement is ▮▮▮▮▮ (with some variation on that range depending on which patents are found to infringe).  2022 Report, ¶¶ 175-211 (surveys analysis), ¶¶ 216-228 (ascertaining the apportioned benefit to ecobee from the '890 Patent separate from the other patents-in-suit), 473-474, 480, 493-495, Exhibit 8A, Exhibit 8A.1; Ex. 2, de la Iglesia Rpt. ¶¶ 610-626. Mr. Kennedy opines that the parties to the hypothetical negotiation would consider that this calculated range of benefits is well above the ▮▮▮ per unit rate negotiated in the DSJ Licenses, which indicates that this per-unit rate would be reasonable. 2022 Report, ¶ 480.

Mr. Kennedy also looks at various upward and downward pressures in this rate, discussed through his *Georgia-Pacific* analysis.  For example, Mr. Kennedy recognizes and acknowledges that ecobee would have a basis at the hypothetical negotiation to argue that the fact that the operating freedom provided by the portfolio nature of the DSJ Agreements puts a downward pressure on the rates derived therefrom, even though the focus of those agreements was a subset of Asserted Patents. 2022 Report, ¶¶ 459-468, 479.  However, this would be offset by other upward pressures, including extensive convoyed sales that ecobee obtains through its

infringement that are not otherwise reflected in the royalty base, and the difference in litigation risk between the DSJ Agreements and the hypothetical negotiation, where infringement and validity is presumed, in contrast to the circumstances presented by the DSJ Agreements, where infringement and validity were disputed. *Id.* ¶¶ 163-169, 368-375, 412-419, 479, 481-482.

## III.    ARGUMENT

### A.    Mr. Kennedy's Reasonable Royalty Opinion Is Supported By A Patent-Specific Apportionment Analysis That Accords With Evidence And Law.

#### 1.    Mr. Kennedy satisfies the Federal Circuit's requirements for "built-in apportionment" using highly comparable licenses.

Mr. Kennedy's analysis of the DSJ Agreements is based on unrebutted technical opinions establishing that the specific Asserted Patents in this case are highly comparable to the patents and smart thermostat technologies that were the focus of the DSJ Agreements. *See* Section II.B, *supra*. Having established the DSJ Agreements are technically and economically comparable to the hypothetical negotiation, covering the same smart thermostat products and technologies, Mr. Kennedy therefore satisfies the Federal Circuit's test for "built-in apportionment" by using the per-unit rate stated expressly in the DSJ Agreements. *See* Section II, *supra*. Where an expert relies on apportioned rates, "no further apportionment is required." *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1376 (Fed. Cir. 2020) ("[U]nder the expert's reasoning, no adjustment of the 15% royalty in the comparable licenses was required. His analysis could reasonably be found to incorporate the required apportionment. Our case law does not require more."). Apportionment through comparable royalty rates is particularly appropriate where, as here, the products licensed in the comparator license, and the relationship of the patented technology to the licensed products, are similar to that in the accused products. *See Elbit Sys Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1301 (Fed. Cir. 2019) (damages experts' testimony "allowed the jury to find that the components at issue, for purposes of

apportionment to the value of a larger product or service, were comparable to the components at issue in the [hypothetical] agreement"). Thus, "a party relying on a sufficiently comparable license can adopt the comparable license's royalty rate and royalty base without further apportionment and without proving that the infringing feature was responsible for the entire market value of the accused product." *Vectura Ltd. v. Glaxosmithkline LLC*, 981 F.3d 1030, 1041 (Fed. Cir. 2020) (apportionment through comparable license appropriate where license covered similar technologies and products as the patent in suit and accused products); *see also Pavo Solutions LLC v. Kingston Tech. Co., Inc.*, 35 F.4th 1367, 1380 (Fed. Cir. 2022) (where expert provided sufficient evidence of comparability establishing "already built[-]in apportionment," relying on the rates therein "correctly apportioned for non-infringing features.")

Mr. Kennedy's opinion applies the acceptable methodologies in *Bio-Rad, Elbit, Vectura,* and *Pavo.* Having established the close comparability of the DSJ Agreements and the products licensed thereby, Mr. Kennedy "can adopt the comparable license's royalty rate and royalty base without further apportionment." *Vectura,* 981 F.3d at 1041. In view of this case law, ecobee's criticisms simply miss the mark. ecobee does not dispute the comparability of the licensed products and technologies. ecobee has not challenged the underlying technical opinions that establish that the licensed smart thermostats made by Daikin, Schneider, and Johnson Controls are technically comparable to ecobee's smart thermostats, and that the patented technologies that were at issue in the litigation settled by those licenses are comparable to ecobee's accused features. *See* Section II.B, *supra.* This permits Mr. Kennedy to adopt the rates in the agreements as a form of apportionment.

2.   **Mr. Kennedy's apportionment analysis establishes the nexus between the technology covered by the DSJ Agreements and the Asserted Patents and apportions among them.**

ecobee ignores Mr. Kennedy's analysis of how the hypothetical negotiators would adjust

for differences between the number of patents in the hypothetical negotiation and the number of licensed patents in the DSJ Agreements, which were portfolio licenses. Mr. Kennedy's conclusion that ecobee would agree to pay the same per unit rate that EcoFactor's licensees paid is supported by a reliable methodology that is tied to specific evidence, including unrebutted technical opinions, which is nothing like the methodologies that have been rejected at the Federal Circuit.

Mr. Kennedy begins by assessing whether the DSJ Agreements, or the negotiations that preceded them, focused on any specific patents in EcoFactor's portfolio, such that the per-unit royalty rate appearing in the DSJ Agreements would reflect the value of particular patents within the portfolio. *See Apple Inc. v. Wi-LAN Inc*., 25 F.4th 960, 973 (Fed. Cir. 2022) (recommending that experts assess whether specific patents were the focus of a license, whether because the license settled litigation or because the patents are called out in the agreement or during negotiations). Mr. Kennedy relies on overwhelming evidence that only a handful of patents drove the value of the DSJ Agreements, and that the parties calculated the royalty based on the patents asserted to be infringed by the licensee in the litigation preceding the settlements. 2022 Report, ¶¶ 331-338; 2021 Report, ¶¶ 308-309. His analysis is supported by the technical experts and the evidence from the DSJ litigation, the language of the DSJ Agreements, contemporaneous negotiation documents, and witness testimony. *See* Section II.B, *supra*.

Mr. Kennedy also relies[4] on both Mr. Zeidman's and Mr. de la Iglesia's conclusions that each licensee acquired coverage for the same smart thermostat technologies as are at issue in the hypothetical negotiation. *Id*.  EcoFactor's experts specifically explain how each patent in this case

---

[4]  ecobee fails to address these comparability opinions, and it should not be permitted to collaterally attack those opinions through this motion. *See GREE, Inc. v. Supercell Oy*, No. 219CV00070JRGRSP, 2020 WL 4057640, at *6 (E.D. Tex., July 20, 2020) (holding that it is appropriate for damages experts to rely on technical experts on technical issues, and those technical opinions and the damages expert's reliance thereon cannot be attacked through a *Daubert* motion against the damages expert.).

corresponds to the technologies covered by the patents that are called out in the DSJ Agreements. *Id.* Having ascertained that EcoFactor's licensees acquired coverage for the same smart thermostat technologies on technically comparable and related patents to those at issue in this case, Mr. Kennedy properly concludes that the ███ per-unit rate does not reflect the value of the entire portfolio, only the smart thermostat technologies that were at issue in those litigations and that are comparable to the ones at issue in this case. 2022 Report, ¶¶ 331-340.

Nevertheless, Mr. Kennedy opines that at hypothetical negotiation, ecobee would argue that the wider freedom to operate granted by a portfolio license, even one focused on a subset of the portfolio, should place downward pressure on the royalty rate in the hypothetical negotiation. 2022 Report ¶¶ 459-468, 479.  But he concludes that this downward adjustment would be offset by the upward adjustment that would be warranted to account for the difference in litigation risk between the DSJ Agreements and the hypothetical negotiation, where infringement and validity is presumed, in contrast to the circumstances presented by the DSJ Agreements, where infringement and validity were disputed. 2022 Report, ¶¶ 469-471, 479.

### 3. Mr. Kennedy also apportions through his survey and profit apportionment analysis, which allows for apportionment of the value attributable to each of the patents-in-suit.

In addition to the foregoing, Mr. Kennedy also apportions down to the level of the specific patents at issue in the hypothetical negotiation by analyzing ecobee's extensive survey evidence and its marginal profits to differentiate the value of the infringing features from the non-infringing features, and to further differentiate the value of the features that only infringe the '890 patent from the features that infringe each Asserted Patent. *See* Section II.C, *supra.* The Federal Circuit has held that an expert's methodology must be tied to the facts of the case at issue (*Kumho Tire Co. Ltd. et al. v. Carmichael et al.*, 526 U.S. 137 (1999)), and has specifically endorsed apportionment analyses that look to studies conducted or "commissioned by [Defendant] in the

ordinary course of its business." *Summit 6, LLC v. Samsung Elec. Co., Ltd.,* 802 F.3d 1283, 1297 (Fed. Cir. 2016).  That is what Mr. Kennedy did.

Mr. Kennedy analyzed ecobee's surveys (2022 Report, ¶¶ 175-211) and ecobee's profits (2022 Report, ¶¶ 225-226, Exhibit 8A), and relied on Mr. de la Iglesia's technical analyses of the surveys, to apportion the benefits provided by the Asserted Patents from those provided by non-patented features, and to apportion those benefits between the Asserted Patents, by generating ***ranges of apportioned benefits*** from the surveys and ***applying*** these ranges to ecobee's profits. *See* Section II.C, *supra,* summarizing 2022 Report, ¶ 431, referencing ¶¶ 212-228, 473-474, 480, 493-495, Exhibit 8A, Exhibit 8A.1, Exhibit 8B. Mr. Kennedy explains that the parties to the hypothetical negotiation would consider that these calculated ranges of benefits are well above the ▮▮▮ per unit rate negotiated in the DSJ Licenses, and therefore, this per-unit rate would be reasonable. 2022 Report, ¶ 480. This provides an independent, but complementary, method of apportioning to the Asserted Patents.

Mr. Kennedy also used the surveys, and Mr. de la Iglesia's opinions on the nexus between specific responses and the patents-in-suit, to calculate a separate range of apportioned benefits for the '890 patent as compared to the other Asserted Patents. *See* Section II.C., *supra*. This permitted Mr. Kennedy to apportion between each of the Asserted Patents, and to address what the royalty rate should be if only a subset of the Asserted Patents is found to be valid and infringed. *Id.,* discussing 2022 Report, ¶¶ 227-228, 493-495 (partial liability opinions using the survey apportionment analysis).

> **4.     Mr. Kennedy's opinions are distinguishable from *Omega* and *Wi-LAN* because they rely on specific evidence establishing the nexus between the key patents in the DSJ Agreements to the patents asserted against ecobee, including unrebutted technical opinions, and other evidence.**

Mr. Kennedy's opinion is wholly distinguishable from the opinion excluded in *Omega*

████████████████████

*Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1380 (Fed. Cir. 2021).  There, the expert exclusively relied on plaintiff's purported licensing policy that applied a five dollar per unit royalty regardless of the number of patents licensed.  The expert's evidence of this rate was most-favored-nations clauses that did not, in fact, show that policy would have been used at the hypothetical negotiation. *Id.* ("Omega simply has not pointed to evidence that any of the relevant most-favored-nation clauses would be implicated by a one-patent license to CalAmp at a rate of less than $5.00 per unit.").  And there is no indication that this expert was relying on a technical expert's analysis.

Here, Mr. Kennedy relies on technical opinions explaining that the seven patents asserted against Daikin and Schneider, and the four patents asserted against Johnson Controls, all cover technologies that are also covered by the patents asserted against ecobee: HVAC Performance Modeling, Smart Scheduling and Occupancy Detection, and Demand Reduction. *See* Section II.B, *supra*.  Because the licensees acquired patent rights covering these technologies, the jury has a proper basis to conclude that the ███ per-unit rate in the DSJ Agreements represents the market value for the specific features covered by the patents EcoFactor asserts against ecobee, and corroborates Mr. Habib's testimony that ███ is the minimum royalty EcoFactor accepts for infringement of the smart thermostat technologies covered by the patents-in-suit. The Federal Circuit condones this real-world approach to determining a royalty rate apportioned to comparable features and products. *Elbit Systems Land et al. v. Hughes Network Systems*, 927 F.3d 1292, 1302-03 (Fed. Cir. 2019).

ecobee also cites *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960 (Fed. Cir. 2022) as supporting its claim that Mr. Kennedy fails to address the nature of the DSJ Agreements as portfolio licenses. However, *Wi-LAN* is clearly distinguishable. The *Wi-LAN* court focused on the lack in that case of any fact evidence that the patents in suit were more important to the parties to the license than

the rest of the portfolio, because (a) the licenses were not settlements and so not focused on particular asserted patents; and (b) the patents in suit were either not listed at all in the licenses or listed only as one of hundreds of patents. *Id.* at 973. The opposite is true here. The DSJ Agreements settled litigation in which only a handful of patents in the portfolio was asserted, these patents were the only patents called out by number in the licenses, and the terms of the license repeatedly refer to the "Asserted Patents" and the underlying litigation. *See* Section II.B, *supra*. This is the reverse of *Wi-LAN*, where there was no evidence that the patents-in-suit were important to the licensee or that the technology covered by the patents-in-suit was a focus of the license negotiations.

Moreover, in *Wi-LAN*, Mr. Kennedy was not relying on a technical expert's opinion that specifically addressed the comparability of the patents-in-suit to the patents licensed in the licenses at issue. The *Wi-LAN* Court faulted Mr. Kennedy for "silence on these equally situated patents." 25 F.4[th] at 974. But Mr. de la Iglesia's and Mr. Zeidman's unrebutted comparability opinions on this issue, and Mr. Kennedy's express reliance thereon, filled any such silence in this case.

**B.     Mr. Kennedy does not argue that the per-unit rate from the DSJ Agreements is an "established royalty," and conducts a full *Georgia-Pacific* analysis as required under the law, although he does rely on ample evidence supporting that the per-unit rate from the DSJ Agreements would be a reasonable royalty for ecobee to pay.**

ecobee claims that Mr. Kennedy is improperly treating the per-unit rate from the DSJ Agreements as an "established rate." Mot. at 6-8. What ecobee means is that Mr. Kennedy does not meet the multi-factor legal test for finding a rate is so well established that no reasonable royalty analysis is required at all. Mot. at 6, citing *Trell v. Marlee Elec's Corp.,* 912 F.2d 1443, 1446 (Fed. Cir. 1990). But ecobee well knows that Mr. Kennedy is not using the term "established" in that specialized sense, but uses the term in the plain meaning sense in which it is

████████████████████████████████

used in *Georgia-Pacific* Factor 1: "The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty," *i.e.,* comparable licenses entered into by the patent holder providing information relevant to determining a reasonable royalty. *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). Mr. Kennedy will not opine at trial that the per-unit rate is "established" in the specialized sense, and if there is any question of confusion on this issue, he need not even use the word "established" at trial. Given his thorough analysis of all the *Georgia-Pacific* factors, he is clearly not sidestepping the requirement to perform a reasonable royalty analysis.

To the extent that ecobee is instead arguing that Mr. Kennedy should be forbidden from even mentioning the per-unit rate that is expressly stated in the DSJ Agreements, on the theory that this is not "based on sufficient facts or data," that argument should be squarely rejected. As discussed above in Section II.A, no "extrapolation" is needed to understand the import of the express statements in the licenses themselves that the royalty therein is based on ███████████ ████████████████████████████████████████ That this statement is consistent across all three licenses corroborates its relevance in any one of them. Mr. Kennedy also relies on contemporaneous negotiation documents confirming both that EcoFactor *sought* the █████ per unit rate and ██████████████████████████████████████ ██████████████████. *See* Section II.A, *supra*. And he relies on the sworn testimony of the EcoFactor decisionmaker who agreed to and signed the licenses. *Id.*

ecobee apparently disagrees with Mr. Kennedy that the per-unit rate in the DSJ Agreements is a relevant data point at the hypothetical negotiation, arguing instead that only the lump sums matter. Mot. at 13. But this dispute over the evidence is not a basis for exclusion. Mr. Kennedy's opinions are based on "sufficient facts or data," and ecobee's criticisms go to the

weight, not admissibility of his opinions. *ProTradeNet, LLC v. Predictive Profiles, Inc.*, No. 6:18-CV-00038-ADA, 2019 WL 6499488, at *3 (W.D. Tex. Oct. 11, 2019), quoting *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1299 (Fed. Cir. 2015) ("[D]isputes over . . . the accuracy of the underlying facts are for the jury.").  *See also i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010) ("When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility.").

     **C.**    **Mr. Kennedy's opinions do not rely on speculation about the licensee's intent, and in any event, ecobee's disagreements about the meaning or import of the evidence relied on by Mr. Kennedy goes to the weight of that opinion, which is not a basis for exclusion.**

ecobee argues that experts, such as Mr. Kennedy, should be forbidden from relying on statements in a license explaining how the royalty was calculated, because doing so crosses over into speculation about the licensees' intent. Mot. at 14-15. But ecobee cannot show that Mr. Kennedy's testimony about the statements in the licenses amounts to improper speculation about the licensee's intent, particularly in view of the particularly in view of the Federal Circuit's recent holding in *Pavo Sols. LLC v. Kingston Tech. Co., Inc*., 35 F.4th 1367, 1379 (Fed. Cir. 2022), that it is entirely appropriate for a damages expert to rely on statements in a license explaining how the royalty therein was calculated. Nor is it improper for Mr. Kennedy, as an expert on patent damages with extensive experience in both reviewing patent licenses in that context and in the real-world negotiation of patent licenses, to apply that experience in evaluating the licensing evidence before him. And there is nothing methodologically improper about Mr. Kennedy applying his considerable licensing experience to opine on how the parties to the hypothetical negotiation would weigh and consider the various provisions in the DSJ Agreements, including statements that Mr. Kennedy places greater weight on (such as the provisions emphasizing the

per unit rate) as well as statements that he places less weight on. After all, the entire concept of a hypothetical negotiation is to analyze the positions the parties would take, based on the evidence. Opining on what a party would likely believe or argue in this sense is entirely appropriate, where it is relevant to the issue on which the expert is opining and based, as it is here, on the evidence. *See, e.g., United Food & Com. Workers Loc. 1776 v. Teikoku Pharma USA,* 296 F. Supp. 3d 1142, 1194 (N.D. Cal. 2017) (distinguishing *Foxomax*).

At bottom, ecobee's disagreement about the relevance of the per-unit rate in the DSJ Agreements to the hypothetical negotiation is a factual dispute, not a methodological one. ecobee's complaint that Mr. Kennedy does not have testimony from the licensees establishing all the reasons they agreed to each term in the DSJ Agreements misses the mark, as the absence of such testimony is irrelevant where plenty of other, reliable evidence *is* in the record, including the DSJ Agreements, the associated negotiation documents, and the testimony of EcoFactor's CEO. The jury is entitled to weigh the facts and decide for themselves how to weigh this testimony.

### D. Mr. Kennedy Properly Opines That The Parties Would Conduct One Hypothetical Negotiation

In *LaserDynamics, Inc. v. Quanta Compute, Inc.*, 694 F.3d 51, 75-76 (Fed. Cir. 2012), the Federal Circuit excluded an expert opinion that set the hypothetical negotiation three years after the date of first infringement, where the expert argued that the later date justified ignoring 29 of the plaintiff's earlier licenses. Similarly, *Finalrod IP, LLC v. John Crane* involved a hypothetical negotiation date three years before the date of first infringement. Neither case concerned the circumstances here, where the date of first infringement of two patents in suit is a few months before the date of first infringement of another.  Mr. Kennedy's opinion that the parties would conduct one hypothetical negotiation, where first infringement for the '890 patent is 4 months after the first infringement of the '186 and '100 patents, is reasonable, and indeed it is fairly

typical among damages experts to posit a single hypothetical negotiation where dates of first infringement are close in time and separating them would have no effect.  In fact, ecobee's expert in the first of the two cases consolidated here, Michelle Riley, makes the exact same argument, opining that although the two patents then in suit had two different dates of first infringement, "[g]iven that ecobee's first alleged infringement of each of the Patents-in-Suit are both within a two-month window, I assume that the date of the hypothetical negotiation would have been on or around November 2019."  Ex. 11, October 22, 2021 Riley Report, ¶ 209.

ecobee tries to argue that there was some change in circumstances during the four months between dates of first infringement, but this *ipse dixit* is entirely belied by the opinion of its damages expert in the second case consolidated here, Melissa Bennis.  Ms. Bennis opines that formally there would have been two hypothetical negotiations, but when she actually analyzes what would occur at a hypothetical negotiation in this case, she does not mention any differences between the facts or considerations relevant at only one of the negotiations, and in fact does not refer to two negotiations at all.  Ex. 4, Bennis Rpt. at 121-125.  *See also* Ex. 12, January 10, 2023 Rough Tr. of Bennis Dep. at 133-136 ("And is there any practical effect on your opinion of having two different hypothetical negotiation dates? A. Not necessarily for the outcome of these particular opinions.")

## IV.     CONCLUSION

For the foregoing reasons, EcoFactor respectfully requests that the Court issue an Order denying ecobee's motion to exclude Mr. Kennedy's opinions.

Date:  January 13, 2023

Respectfully submitted,

/s/ *Reza Mirzaie*

Reza Mirzaie
Marc A. Fenster
Adam Hoffman
James Pickens
Kris Davis
RUSS AUGUST & KABAT
12424 Wilshire Boulevard 12th Floor
Los Angeles, California 90025
Tel: 310-826-7474
Fax: 310-826-6991
rmirzaie@raklaw.com
mfenster@raklaw.com
ahoffman@raklaw.com
jpickens@raklaw.com
kdavis@raklaw.com

*Attorneys for Plaintiff EcoFactor, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document is being served upon counsel of record for Defendant on January 13, 2023 via electronic service.

<u>/s/ Reza Mirzaie</u>